TELXON CORPORATION, Plaintiff Below, Appellant,

v.

Robert F. MEYERSON, Dan R. Wipff, Robert A. Goodman, Dr. Raj Reddy and Norton W. Rose, Defendants Below, Appellees.

No. 328, 2001.

Supreme Court of Delaware.

Submitted: Jan. 16, 2002.

Resubmitted Following Supplemental Briefing: April 4, 2002.

Decided: June 7, 2002.

Reargument Denied July 30, 2002.

Joseph A. Rosenthal, Carmella P. Keener, Rosenthal, Monhait, Gross & Goddess, P.A., Wilmington, Delaware, Sidney B. Silverman, (argued), New York City, for appellant.

Steven J. Rothschild, (argued), Paul J. Lockwood, Sean K. Hornbeck, Skadden, Arps, Slate, Meagher & Flom, Wilmington, Delaware, for appellees Robert F. Meyerson, Dan R. Wipff, Dr. Raj Reddy and Norton W. Rose.

Henry E. Gallagher, Jr., (argued), Connolly Bove Lodge & Hutz, LLP, Wilmington, Delaware, Steven J. Miller, Drew A. Carson, Goodman Weiss Miller, LLP, Cleveland, Ohio, for appellee Robert A. Goodman.

BEFORE: WALSH, HOLLAND, and BERGER, Justices.

WALSH, Justice:

In this appeal, we consider the propriety of the Court of Chancery's decision to grant summary judgment in a derivative action subsequently pursued by a successor corporate entity against its former directors. The complaint, originally asserted as a stockholders' derivative action, challenged the level of compensation that Directors had been receiving as well as Directors' decision for the corporation to acquire a minority interest, and later 100%, of a company owned by the corporation's then-Board Chairman. Following cross-motions for summary judgment, the Court of Chancery granted judgment to the Directors on the excessive compensation claims and the duty of loyalty claims, but denied summary judgment as to two duty of care claims in which there were disputes of fact. Because the corporation's charter contains an exculpation provision, the plaintiff chose to forego prosecution of the duty of care claims in order to convert the Court of Chancery's dismissal order into an appealable final judgment.

Upon a full review of an enlarged record, we conclude that the unsettled nature of that record does not permit resolution through summary judgment. Accordingly, we reverse the decision of the Court of Chancery granting summary judgment and remand this case for further proceedings to resolve factual differences apparent in the record.

I

Telxon is a Delaware corporation that develops and markets portable hand-held computers for retailers and wholesalers in various industries. Between 1991 and 1993 (the time period relevant to this action), the Telxon board of directors consisted of Raymond Meyo, Dan Wipff, Robert Meyerson, Raj Reddy, Norton Rose and Robert Goodman. Meyerson was also the CEO of Telxon from 1978 to 1985. During the late 1980s and early 1990s, Meyerson continued to serve as the Chairman of the Board, and provided part-time consulting services to Telxon. The parties continue to dispute whether Meyerson was an executive at this time, or served as a non-executive Chairman.

In 1985, Meyo succeeded Meyerson as CEO and continued as Telxon's CEO until he resigned in October, 1992[1]. Director Wipff was Telxon's Chief Financial Officer from December 1991 through January 1995. Beginning in October 1992, Wipff also served as its President and Chief Operating Officer. Director Goodman was the senior partner of Goodman Weiss Mil-

---

1. Meyo was dismissed as a defendant in this case in November, 1998. That decision has not been appealed.

ler LLP, a Cleveland, Ohio law firm that provided legal services to Telxon and, in the past, had also provided services both to Meyerson personally and to another company that Meyerson owned. Director Reddy was the Dean of the School of Computer Science at Carnegie Mellon University and a well recognized leader in the field of computer science. Director Rose was the President and Principal/Owner of Norton W. Rose & Co., a Cleveland, Ohio consulting firm.

Telxon began experiencing operational problems in 1989, and the board decided that Meyerson should be engaged to assist Meyo in managing the corporation. To that end, Telxon entered into a consulting agreement with Meyerson's wholly-owned company, Accipiter Corporation ("Accipiter"). Under the 1989 consulting agreement, Accipiter (through Meyerson) agreed to perform technical and marketing services necessary for the planning and development of new products. The agreement further provided that Accipiter's work product, created pursuant to the contract, would become the property of Telxon, and Accipiter could not "render similar consulting services to any direct competitors of Telxon in the PTC market." On March 6, 1992, Telxon entered into a new three-year consulting agreement with Accipiter, under which Accipiter agreed to provide management consulting, corporate and financial analysis, and marketing development services, as requested by Telxon. Specifically, Accipiter would provide Telxon with "140 eight hour days per year of consulting services, the majority to be provided by Meyerson." In return, Accipiter would receive $840,000 annually, plus $240,000 for general administrative and overhead costs, plus reimbursement for its travel and other out-of-pocket expenses.

In August of 1991, Meyerson began to explore the possibility of developing a product known as "pen based computers" ("PBCs"). The parties continue to dispute whether Meyerson offered this opportunity to the Telxon board. The Court of Chancery determined that Meyerson did offer PBC technology to the Telxon board, and the board decided that Telxon should not develop its own PBC product directly, because of the expense involved, but should allow Meyerson to develop it while retaining a stake in Meyerson's work. At oral argument before this Court, Directors asserted that there are board minutes reflecting the consideration, and rejection, by the board of a proposal by Meyerson for Telxon to develop PBCs. Because the record developed in the Court of Chancery did not include such minutes, and in view of Telxon's strenuous argument that the minutes reflect no such consideration by the board, Directors were required to supplement the record on appeal to sustain their contentions. Directors have been unable to produce any such documentation, but continue to allege that then-CEO Meyo considered and rejected the opportunity for Telxon to develop PBCs.

Despite the absence of supporting minutes, it is undisputed that in August or September of 1991, Meyerson (who at that point was consulting for Telxon part-time) chose to pursue development of PBC technology on his own and formed Teletransaction for that purpose. At some point (the timing of which is disputed[2]), the Telxon board decided that it should acquire some interest in Teletransaction. The Court of Chancery found that, at a February 12, 1992 board meeting, the board approved a

---

**2.** Following oral argument, we allowed the parties to supplement the record with previously redacted Telxon board minutes which reflect that the board considered buying Teletransaction from Meyerson as early as September, 1991.

plan for Telxon to invest in Teletransaction in incremental steps. First, Telxon would acquire a 15% interest in Teletransaction. Second, upon the successful completion of a PBC prototype, Telxon would acquire an additional 30% interest for $3 million, increasing its ownership interest to 45%. Third, after Teletransaction had PBC products that were ready for sale, Telxon would purchase an additional 35% stock interest for $3.5 million, bringing its total ownership interest in Teletransaction to 80%. Although Telxon agrees that the board did seek to acquire Teletransaction, it disputes the reasoning and timing attributed to the board by the Court of Chancery. The parties agree, however, that Meyerson abstained from any discussions of the Teletransaction acquisition.

In March 1992, Telxon began its acquisition of Teletransaction by purchasing 15% of Teletransaction's stock for $1.7 million, the bulk of which was distributed directly to Meyerson and members of his family. Again, it is unclear whether this transaction was part of a larger scheme to acquire Teletransaction incrementally. Six months later, however, on October 14, 1992, Meyo suddenly resigned as CEO. The Court of Chancery found that the Telxon board then concluded that the emergency caused by Meyo's resignation made it advisable for Telxon to acquire 100% of Teletransaction, rather than 80% in three stages, so that Meyerson would agree to resume his post as CEO of Telxon. Accordingly, on October 20, 1992, the board authorized Telxon to acquire an additional 30% of Teletransaction for $3 mil-

lion [3] "as a down payment and a part of the process of negotiation for the acquisition of all, or substantially all of the stock of [Teletransaction], and as part of the inducement to Mr. Meyerson to accept the role as full-time Chief Executive Officer of Telxon...."

In November 1992, during negotiations between Meyerson and Telxon over the terms of Meyerson's return to Telxon, Meyerson demanded an additional $5 million above the initially agreed price for Telxon's purchase of 80% of Teletransaction. Meyerson told the board that the additional $5 million would compensate him for (i) his sale of the 20% residual equity in Teletransaction he had originally intended to retain, and (ii) his commitment to become full-time CEO of Telxon, rather than a part-time consultant. After discussing Meyerson's proposal and receiving a fairness opinion from an independent financial advisor, Unterberg Harris, the board, without Meyerson present, approved that proposal subject to certain conditions. The total consideration for the 100% purchase of Teletransaction, as consummated in 1993, would be $17.3 million.

This action followed soon thereafter. The complaint challenged the acquisition of Teletransaction both at the point that the initial 15% interest was acquired and when the purchase was consummated. Telxon argues that since it already owned all rights to the PBC developed by Meyerson under the consulting agreement, the decision to later purchase Teletransaction, whose only asset was the PBC technology, was a breach of the Directors' fiduciary

3. The parties dispute whether by this point Teletransaction had developed a working PBC prototype. Under the alleged three step plan, a working prototype was a pre-condition for Telxon to invest any further in Teletransaction. The trial court resolved this dispute in favor of Directors, because four people testified by deposition to having seen the working prototype at a national trade show called Scan Tech on October 6, 1992. Telxon's only evidence to the contrary is the negative inference drawn by their expert, Dr. Portia Isaacson, from the fact that when she was evaluating Teletransaction she asked to see the prototype and was refused.

duties and, as to Meyerson, a misappropriation of a corporate asset and usurpation of a corporate opportunity.

The complaint also challenged the compensation paid to Directors during this time frame. Directors Rose, Reddy, and Goodman, as non-executive directors, received an annual retainer of $20,000 and a fee of $2,500 for each board meeting and committee meeting attended in person and $1,250 for each meeting attended by telephone. During fiscal year 1993, the board met twenty-four times and committees served on by Directors Rose, Reddy and Goodman met fourteen times. The compensation for each of these three directors was therefore approximately $90,000. In addition, they were each retained as a consultant and paid $30,000, $25,000, and $10,000, respectively. Meyerson's compensation under the consulting agreements with Accipiter was also challenged as excessive.

The Court of Chancery granted summary judgment in favor of Directors on the compensation claims and the duty of loyalty claims. This appeal followed.

## II

■ We review *de novo* the Court of Chancery's decision on cross-motions for summary judgment. *Stroud v. Grace,* 606 A.2d 75, 81 (Del.1992). In evaluating the record on a motion for summary judgment, a trial judge is not permitted to weigh the evidence or resolve conflicts presented by the pretrial discovery. *Cerberus Intern., Ltd. v. Apollo Management, L.P.,* 794 A.2d 1141, 1149–50 (Del.2002). As we stated in *Cerberus,* "[t]he test is not whether the judge considering summary judgment is skeptical that plaintiff will ultimately prevail," but whether the evidence, when viewed in the light most favorable to the nonmoving party, presents any dispute of material fact. *Id.* at 1150. The trier of fact may weigh the evidence and resolve disputes only after hearing all the evidence, including live witness testimony. *Id.* (noting that where a determination of credibility must be made, summary judgment is inappropriate). "This is an axiom of the judicial process and applies unless the parties have stipulated that the paper record shall constitute the trial record." *Id.* at 1149, *citing Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (noting that trial courts should act "with caution" in granting summary judgment); *Kennedy v. Silas Mason Co.,* 334 U.S. 249, 257, 68 S.Ct. 1031, 92 L.Ed. 1347 (1948) ("We consider it the part of good judicial administration to withhold decision ... until this or another record shall present a more solid basis of findings based on litigation or on a comprehensive statement of agreed facts.") Cross-motions for summary judgment are not the procedural equivalent of a stipulation for decision on a paper record. *Empire of Am. Relocation Servs., Inc. v. Commercial Credit Co.,* 551 A.2d 433, 435 (Del.1988).

■■ Initially, Telxon contends that it was entitled to have summary judgment granted in its favor. There is no "right" to a summary judgment. *Anglin v. Bergold,* 565 A.2d 279 (Del.1989); *Brunswick Corp. v. Bowl–Mor Co., Inc.,* 297 A.2d 67, 69 (Del.1972). A trial court's denial of summary judgment is entitled to a high level of deference and is, therefore, rarely disturbed. *Id.* Additionally, we have determined that the existence of factual disputes makes this case an inappropriate one for summary judgment in favor of either party.

## III

■ Telxon alternatively argues that the Court of Chancery erred when it

found, as a matter of law, that Meyerson was free to develop PBC technology on his own. It is unclear whether Telxon is urging a misappropriation theory or a corporate opportunity theory, or both. Directors argue that Telxon raised neither theory below and are therefore barred from raising them on appeal. *See* Supr. Ct.R. 8. In its complaint, however, Telxon did make a claim that Meyerson "misappropriated a corporate asset," and that issue was briefed in the trial court. Accordingly, although it was not addressed by the trial court in its decision, the issue was fairly presented to that court and thus properly a subject of appeal.

The corporate opportunity theory, too, was implicitly raised below, in the argument that Meyerson breached his duty of loyalty by usurping an opportunity for himself that rightfully belonged to Telxon. As we have previously recognized, this Court may rule on an issue fairly presented to the trial court, even if it was not addressed by that court below. *Standard Distrib. Co. v. Nally,* 630 A.2d 640, 647 (Del.1993). Furthermore, on this record we need not necessarily reach the merits of either the misappropriation or the corporate opportunity claim, if we are satisfied that facts bearing on the claims remain in dispute and should not have been the subject of a summary judgment.

■ We agree with Telxon, however, that the Court of Chancery erred when it found that Meyerson was free to develop PBC technology on his own because "the Board made a business decision that Telxon should not develop directly its own PBC product." *Merchants' Nat. Properties, Inc. v. Meyerson,* 2000 WL 1041229, *2 (Del.Ch.2000). The question of whether Meyerson ever presented the opportunity to develop PBCs to the Telxon board remains a hotly disputed one. At oral argument before this Court, we attempted to have the parties clarify their disparate views reflected in their briefs. Despite their claims of board participation, Directors could not produce board minutes reflecting that Meyerson had presented the PBC opportunity to the board. Following supplemental briefing on the effect of this omission, and an expanded record, Directors continue to argue that Meyo, as the CEO, decided that Telxon should not pursue development of PBCs directly and that the board deferred to Meyo's judgment on the issue.

■ While presentation of a purported corporate opportunity to a board of directors, and the board's refusal thereof, creates a safe harbor for an interested director, that safe harbor does not extend to an opportunity presented only to the corporation's CEO. *See Broz v. Cellular Info. Sys., Inc.,* 673 A.2d 148, 157 (Del. 1996). Rejection of a corporate opportunity by the CEO is not a valid substitute for consideration by the full board of directors. This proposition is aptly illustrated by the record before us. We do not know the basis of Meyo's decision, if there was such a decision, not to develop PBCs. There is no record reflecting what information Meyo may have relied on to make his decision, or who supplied that information. If Meyerson was Meyo's source of information, his decision cannot be considered an informed one.

■ The expansion of the record to include previously redacted board minutes also revealed that the board considered purchasing Teletransaction from Meyerson as early as September of 1991, just one month after Meyerson created Teletransaction to begin development of PBCs, leaving little time for the Telxon board to have rejected the opportunity to develop PBCs directly. This evidence sheds doubt on any factual conclusion that Meyerson presented the opportunity to the Telxon

board, which it refused. It surely precludes the grant of summary judgment premised on the establishment of that fact. Resolution of whether Meyerson offered Telxon the opportunity to develop PBCs may well depend upon the testimony of various witnesses. Resolving conflicting testimony is the province of a fact finder at a trial, not a judge on summary judgment. Furthermore, the determination of "[w]hether or not the director has appropriated for himself something that in fairness should belong to his corporation is a factual question to be decided by reasonable inference from objective facts." *Johnston v. Greene*, 121 A.2d 919, 923 (Del.1956), *citing Guth v. Loft*, 5 A.2d 503 (Del.1939).

## IV

Telxon also contends that there are disputed issues of material fact as to whether Directors were independent, acted independently, and whether Meyerson deceived the board. Directors argue that the trial court properly found that a majority of the Directors were independent, thereby ratifying the interested purchase of Teletransaction from Meyerson. The Court of Chancery found that four out of five of the Directors were independent from Meyerson, but determined that it was unnecessary to pass on the independence of Director Goodman. Telxon also argues that the Court of Chancery analyzed this claim under a business judgment standard of review when it warranted an entire fairness analysis because Meyerson was concededly interested in the transaction.

Directors must not only be independent, but must act independently. *Kahn v. Tremont Corp.*, 694 A.2d 422, 429 (Del.1997). As this Court has previously stated in defining director independence: "[i]t is the care, attention and sense of individual responsibility to the performance of one's duties … that generally touches on independence." *Id.* at 430, *quoting Aronson v. Lewis*, 473 A.2d 805, 816 (Del.1984). Where only one director has an interest in a transaction, however, a plaintiff seeking to rebut the presumption of the business judgment rule under the duty of loyalty must show that "the interested director controls or dominates the board as a whole." *Cinerama, Inc. v. Technicolor, Inc.*, 663 A.2d 1156, 1168 (Del. 1995).

A party alleging domination and control of a company's board of directors bears the burden of proving such control by showing a lack of independence on the part of a majority of the directors. *Odyssey Partners, L.P v. Fleming Cos., Inc.*, 735 A.2d 386, 407 (Del.Ch.1999). Theoretically, a director can be "controlled" by another, for purposes of determining whether the director lacked the independence necessary to consider the challenged transaction objectively. A controlled director is one who is dominated by another party, whether through close personal or familial relationship or through force of will. *Orman v. Cullman*, 794 A.2d 5, 25 n. 50 (Del.Ch.2002). A director may also be deemed "controlled" if he or she is beholden to the allegedly controlling entity, as when the entity has the direct or indirect unilateral power to decide whether the director continues to receive a benefit upon which the director is so dependent or is of such subjective material importance that its threatened loss might create a reason to question whether the director is able to consider the corporate merits of the challenged transaction objectively. *Id.*

It is undisputed that Meyerson, an obviously interested party, abstained from voting on the Teletransaction matter. Nonetheless, Telxon argues a majority of the other Directors were beholden to Meyerson, as Telxon's executive Chairman of the

Board and "most senior executive," because he was in a position to affect their livelihood. Meyerson did play an integral role in Telxon's management for many years, both during and after his stint as CEO, and it is clear that the other Directors respected his business acumen and often relied upon his counsel. Additionally, Director Goodman's law firm derived a substantial portion of its revenue from Meyerson and his businesses. Given the state of the record, however, we cannot say whether or not the other Directors acted independently or were beholden to Meyerson such that they deferred to his will in the Teletransaction matter.

As previously noted, we allowed the record to be expanded to include previously omitted board minutes showing that Meyerson headed the slate of new corporate officers as Chairman of the Board.[4] Telxon argues that these minutes refute the conclusion reached by the Court of Chancery that Meyerson was merely a non-executive Chairman with no control over the other officers. It is unclear what impact, if any, this revelation would have had on the trial court's analysis, but we believe that it represents a disputed fact that should be resolved only after a trial at which all the facts are presented and the credibility of all the witnesses tested. Only after a full picture of Meyerson's relationship with the other Directors is developed can their independence be ascertained.

## V

■ Finally, Telxon challenges the grant of summary judgment in favor of Directors on the compensation claims. The Court of Chancery granted Directors' motion for summary judgment from the bench, stating only:

> In determining that there's no triable issue of fact and that this claim—that summary judgment should be granted in defendants' favor on this claim, I am not relying on the affidavit of defendants' expert. I'm relying solely upon the other facts and the absence of any facts that would indicate—that is, the absence of any other evidence from the plaintiff's side that would indicate that the level of compensation was so high that the claim should be tried. I cannot see what a trial would accomplish in these circumstances.

*Merchants' Nat. Properties, Inc. v. Meyerson*, C.A. No. 13139, Jacobs, V.C. (Del. Ch. July 24, 2000).

■ Like any other interested transaction, directoral self-compensation decisions lie outside the business judgment rule's presumptive protection, so that, where properly challenged, the receipt of self-determined benefits is subject to an affirmative showing that the compensation arrangements are fair to the corporation. *Hall v. John S. Isaacs & Sons Farms, Inc.*, 146 A.2d 602, 610–11 (Del.Ch.1958), *aff'd in part*, 163 A.2d 288 (Del.1960); *Meiselman v. Eberstadt*, 170 A.2d 720 (Del.Ch.1961); *Wilderman v. Wilderman*, 315 A.2d 610 (Del.Ch.1974). As former Chancellor Allen noted in an earlier stage of this case, director compensation, fixed by the board, is contemplated by Section

---

4. Directors did not produce the August 19, 1992 board meeting minutes below, despite discovery requests from plaintiff encompassing them. Telxon obtained the minutes only after it was re-aligned as plaintiff in November, 2000. Telxon did not discover this omission until its Notice of Appeal had been filed. We agreed to enlarge the record to include these minutes in the interest of justice, cognizant that the Court of Chancery will have the opportunity to decide their import in the first instance. *See Stafford v. Sears, Roebuck & Company*, 413 A.2d 1238, 1239 n. 2 (Del. 1980) (allowing record to be enlarged to include evidence not available below, "in the interest of justice").

141(h) of the Delaware General Corporation Law. The former Chancellor further explained that there is "no single template for how corporations should be governed and no single compensation scheme for corporate directors; amount alone is not the most salient aspect of director compensation, but certainly $100,000 a year or more would not be inappropriate where board service was demanding; and where the number of other boards a director could serve on was carefully limited." *Steiner v. Meyerson,* 1995 WL 441999, *7 (Del.Ch.1995). The Chancellor refused, however, to dismiss Telxon's breach of loyalty claim with regard to the Directors' compensation. *Id.* Although "these amounts seem quite within a range that could be paid in good faith by a company seeking to attract competent, committed directors," the Chancellor felt that Directors would likely be required to prove the reasonableness of this compensation.

Here, the trial court seems to have imposed the burden on Telxon to produce evidence that the Directors' compensation was unreasonable. Although the trial court was unable to see "what a trial would accomplish" here, it would certainly resolve the parties' disputed evidence regarding the Directors' contribution to the corporation, which obviously bears on the question of whether or not their compensation was reasonable. Furthermore, the trial court did not consider the interplay between the Directors' compensation and the possible breach of their fiduciary duties. This claim, too, was decided prematurely.

Accordingly, we reverse the judgment of the Court of Chancery and remand for further proceedings consistent with this Opinion.