950 A.2d 215 (2008)
401 N.J. Super. 222
Carl JOHNSON and Jerry Foster, Derivatively On Behalf of Bradley Pharmaceuticals, Inc., Plaintiffs-Appellants,
v.
Daniel GLASSMAN, Iris Glassman, Bradley Glassman, R. Brent Lenczycki, C. Ralph Daniel, III, Steven Kriegsman, Alan Wolin, Andre Fedida, Michael Fedida and Michael Bernstein, Defendants-Respondents, and
Bradley Pharmaceuticals, Inc., a Delaware Corporation, Nominal Defendant.
No. A-2074-06T2
Superior Court of New Jersey, Appellate Division.
Argued telephonically October 23, 2007.
Decided March 5, 2008.
*217 Steven J. Simerlein, San Diego, CA (Robbins Umeda & Fink) of the California bar, admitted pro hac vice, argued the cause for appellants (Kleeblatt, Galler & Abramson, and Mr. Simerlein, attorneys; Richard P. Galler, Mr. Simerlein and Jeffrey P. Fink (Robbins, Umeda & Fink) of the California bar, admitted pro hac vice, on the brief).
Jamie A. Levitt, New York City (Morrison & Foerster) of the New York bar, admitted pro hac vice, argued the cause for respondents (Epstein Becker & Green, and Ms. Levitt, attorneys; James P. Flynn, Lauren D. Daloisio, Ms. Levitt, Jack C. Auspitz (Morrison & Foerster) and Damion K.L. Stodola (Morrison & Foerster) both of the New York bar, admitted pro hac vice, on the brief).
*218 Before Judges PAYNE, SAPP-PETERSON and MESSANO.
The opinion of the court was delivered by
PAYNE, J.A.D.
Plaintiffs, Carl Johnson and Jerry Foster, suing derivatively on behalf of Bradley Pharmaceuticals, Inc., appeal from the dismissal with prejudice of their consolidated actions against Bradley's officers and its Board of Directors[1] as the result of plaintiffs' failure to adequately plead that, because of their lack of independence and interest in the transactions at issue, Bradley's directors would have failed to act on the Company's behalf if a demand upon the Board to do so had been made at the time that suit was filed.

I.
The parties agree that, because Bradley is a Delaware corporation, Delaware law applies to the issues on appeal. Kamen v. Kemper Fin. Serv's, Inc., 500 U.S. 90, 108-09, 111 S.Ct. 1711, 1723, 114 L.Ed.2d 152, 172 (1991).
In a shareholder derivative action such as this, the shareholder asserts a claim that belongs to a corporation, on behalf of that corporation, in an attempt to compel alleged wrongdoers to compensate the corporation for the injury they have caused. However, as the New Jersey Supreme Court has recognized:
Derivative litigation raises difficult and sometimes controversial issues. [Bradley T. Ferrell, Note, A Hybrid Approach: Integrating the Delaware and the ALI Approaches to Shareholder Derivative Litigation, 50 Ohio St. L.J. 241, 242-43 (1999).] One difficulty is that, although such litigation may compensate the corporation for injuries sustained as a result of wrongful conduct, it also may have a negative effect on corporate governance when frivolous lawsuits initiated by opportunistic shareholders are brought. Id. at 243. If abused, derivative litigation can impede the best interests of the corporation. Ibid. See also James D. Cox, Searching for the Corporation's Voice in Derivative Suit Litigation: A Critique of Zapata and the ALI Project, 1982 Duke L.J. 959, 960 (noting that because derivative-suit plaintiff "usually has no significant financial interest in the corporation, the possibly harmful economic effects of prosecuting the suit cannot be expected to guide his decision to litigate") (footnote omitted).
[In re PSE & G S'holder Litig., 173 N.J. 258, 278, 801 A.2d 295 (2002).]
The requirement that the Board of a corporation be called upon to act on the corporation's behalf before a shareholder derivative action can be filed, or that the shareholder demonstrate with particularity, in the complaint, why such a demand would be futile, arises in actions governed by Delaware law from Delaware Chancery Rule 23.1 and decisions of the Delaware Supreme Court in Aronson v. Lewis, 473 A.2d 805 (Del.1984), overruled on other grounds, Brehm v. Eisner, 746 A.2d 244 (Del.2000), and Rales v. Easco Hand Tools, Inc., 634 A.2d 927 (1993).[2]
*219 The Chancery Rule provides, in pertinent part:
In a derivative action brought by 1 or more shareholders . . . to enforce a right of a corporation . . ., the corporation . . . having failed to enforce a right which may properly be asserted by it, the complaint shall allege that the plaintiff was a shareholder . . . at the time of the transaction of which he complains. . . . The complaint shall also allege with particularity the efforts, if any, made by the plaintiff to obtain the action he desires from the directors . . . and the reasons for his failure to obtain the action or for not making the effort.
The rule is derived from a "cardinal precept" of Delaware corporation law that directors, rather than shareholders, manage the business and affairs of the corporation. Aronson, supra, 473 A.2d at 811. Under Delaware law, "the decision to bring a lawsuit or to refrain from litigating a claim on behalf of the corporation is a decision concerning the management of the corporation and consequently is the responsibility of the directors." Blasband v. Rales, 971 F.2d 1034, 1047 (3d Cir.1992) (citing Levine v. Smith, 591 A.2d 194, 200 (Del.1991), overruled on other grounds, Brehm v. Eisner, 746 A.2d 244 (Del.2000), and Spiegel v. Buntrock, 571 A.2d 767, 773 (Del.1990)). Thus, although a shareholder derivative action serves as a "potent tool [ ] to redress the conduct of a torpid or unfaithful management," Aronson, supra, 473 A.2d at 811, "[b]y its very nature the derivative action impinges on the managerial freedom of directors." Ibid. The demand requirement of Chancery Rule 23.1 insures that a stockholder exhausts his remedies within the corporate structure prior to suit, thereby permitting the corporation's board to fulfill its fiduciary duties, and the requirement acts as a safeguard against strike suits. Id. at 812.
A demand is excused if such a demand would be futile. However, in order to protect the demand requirement from erosion, a heightened pleading standard is imposed when the shareholder asserts demand futility, requiring a degree of particularity absent from traditional notions of notice pleading. Aronson established a standard for demand futility in instances in which board action is challenged, which was restated in Levine, supra, in the following terms:
In determining the sufficiency of a complaint to withstand dismissal under rule 23.1 based on a claim of demand futility . . . [t]he trial court is confronted with two related but distinct questions: (1) whether threshold presumptions of director disinterest or independence are rebutted by well-pleaded facts; and, if not, (2) whether the complaint pleads particularized facts sufficient to create a reasonable doubt that the challenged transaction was the product of a valid exercise of business judgment.[3]
[591 A.2d at 205.]
The second prong of Aronson permits a shareholder suing a corporate board that is structurally independent and presumptively capable of acting impartially on a demand to proceed with a lawsuit on the corporation's behalf if breach of fiduciary duty is pled with sufficient particularity.
In simple terms, the second prong of Aronson can be said to fulfill two important integrity-assuring functions in our law. First . . . the second Aronson prong addresses concerns regarding the *220 inherent "structural bias" of corporate boards, by allowing suits to go forward even over a putatively independent board's objection if the plaintiff can meet a heightened pleading standard that provides confidence that there is a substantial basis for the suit.
Second . . . the second Aronson prong responds to the related concern that a derivative suit demand asks directors to authorize a suit against themselvesi.e., asks them to take an act against their personal interests. If the legal rule was that demand was excused whenever, by mere notice pleading, the plaintiffs could state a breach of fiduciary duty claim against a majority of the board, the demand requirement of the law would be weakened and the settlement value of so-called "strike suits" would greatly increase, to the perceived detriment of the best interests of stockholders as investors. But, if the demand excusal test is too stringent, then stockholders may suffer as a class because the deterrence effects of meritorious derivative suits on faithless conduct may be too weak. The second prong of Aronson therefore balances the conflicting policy interests at stake by articulating a safety valve that releases a suit for prosecution when the complaint meets a heightened pleading standard of particularity, because in these circumstances the threat of liability to the directors required to act on the demand is sufficiently substantial to cast a reasonable doubt over their impartiality.
[Guttman v. Huang, 823 A.2d 492, 500 (Del.Ch.2003) (footnotes omitted).]
In instances in which the board has made no decision relating to the subject of the derivative suit, the business judgment rule underlying Aronson is inapplicable.[4] In this circumstance,
a court must determine whether or not the particularized factual allegations of a derivative stockholder complaint create a reasonable doubt that, as of the time the complaint is filed, the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand. If the derivative plaintiff satisfies this burden, then demand will be excused as futile.
[Rales, supra, 634 A.2d at 934.]
As the Chancery court noted in Guttman, when there are allegations that a majority of the board acted wrongfully, for instance, by failing to accurately account for and disclose corporate financial results, "the Rales test sensibly addresses concerns similar to the second prong of Aronson. To wit, if the directors face a `substantial likelihood' of personal liability, their ability to consider a demand impartially is compromised under Rales, excusing demand." 823 A.2d at 501.
It should also be noted that 8 Del. C. § 220 provides a mechanism by which a shareholder, who has met the statute's procedural requirements and shown a specific proper purpose, can summarily obtain relevant books and records of a corporation in order to establish particularized facts that would further an investigation of corporate wrongdoing and provide a foundation for a claim of demand futility. Rales, supra, 634 A.2d at 931 n. 4 and 934 n. 10. As noted by the Rales Court:
Surprisingly, little use has been made of section 220 as an information-gathering tool in the derivative context. Perhaps *221 the problem arises in some cases out of an unseemly race to the court house, chiefly generated by the "first to file" custom seemingly permitting the winner of the race to be named lead counsel. The result has been a plethora of superficial complaints that could not be sustained.
[Ibid.]
See also Guttman, supra, 823 A.2d at 504 (noting that plaintiffs, in failing to utilize § 220 when amending their complaint, "ignored the repeated admonitions of the Delaware Supreme Court and this court for derivative plaintiffs to proceed deliberately and to use the books and records device to gather the materials necessary to prepare a solid complaint.").

II.
With the above standards in mind, we turn to the facts of this matter, as set forth in plaintiffs' amended complaint.
Bradley Pharmaceuticals, Inc., a publicly traded Delaware corporation with its principal place of business in Fairfield, New Jersey, was founded in 1985 as a specialty pharmaceutical company marketing over-the-counter and prescription drugs made by others, primarily for the treatment of dermatologic, podiatric, respiratory and gastro-intestinal conditions, within the United States and thirty-eight international markets. The company is divided into two divisions, Doak Dermatologics, specializing in topical therapies for dermatology and podiatry, and Kenwood Therapeutics, which focuses on gastroenterology, respiratory and other internal medicine brands. The company's founder, Chief Executive Officer, and Chair of the Board of Directors is Daniel Glassman. Its Treasurer is Daniel's wife, Iris, who is also a Board member. Their son, Bradley, for whom the company was named, commenced service as Senior Vice-President, Sales and Marketing in 2004, and occupied other positions at the Company prior to that. Bradley is not a Board member. In the relevant time period, R. Brent Lenczycki was Chief Financial Officer of the company. He, like Bradley, was not a member of the Board.
In the third quarter of 2004, Bradley made a $1 million sale of Deconamine syrup, a cold medication, to a wholesale supplier. Bradley then re-cast the sale to permit the wholesaler to return the product for a credit against other purchases. Nevertheless, profit from the sale was recognized as income by Bradley in its Third Quarter Press Release, issued on October 28, 2004, and in the Form 10-Q, filed with the Securities and Exchange Commission (SEC) on November 9, 2004.
In December 2004, Bradley was notified by the SEC that it was conducting an informal inquiry "to determine whether there have been violations of the federal securities laws." The SEC's investigation was disclosed to the public by Bradley in a press release, dated February 28, 2005, that additionally stated that "in connection with the inquiry, the SEC staff has requested that the Company provide it with certain information and documents including with respect to revenue recognition and capitalization of certain payments." The press release also noted that "in light of the ongoing SEC staff inquiry and separate counsel's review, the Company will not be releasing its 2004 earnings at this time, as originally anticipated." A sharp decline in stock value resulted from the announcement.
Following receipt of the SEC's notification of its inquiry, and at approximately the time of its February 2005 request for information and documents, the Audit Committee of the Board retained independent counsel to advise it in connection with the inquiry and to conduct a review. *222 Counsel, in turn, retained an independent auditing firm to review Bradley's financials. On March 11, 2005, Bradley issued a press release reporting class action litigation against it. The press release additionally stated:
following discussion with its auditors, [the Company] does not anticipate finalization of its audited financial statements for 2004 until conclusion and evaluation of the previously announced review being conducted by counsel for the Company's Audit Committee. As that review will not be concluded prior to the due date for the Company's Annual Report on Form 10-K, the Company will be unable to file its Form 10-K on a timely basis.
As a result of the lawsuits, SEC Inquiry, Audit Committee review and associated expenses that are not currently estimatable, the Company is withdrawing previously announced financial guidance for unreported periods.
In a Form 8-K, filed with the SEC on April 27, 2005, and in a press release of the same date, Bradley disclosed that, on April 21, 2005, its independent auditors had advised that, during their audit, "they became aware of information indicating that a transaction recorded as a sale by the Company in the quarter ended September 30, 2004 did not meet the criteria for revenue recognition in such period." The notice continued by stating that "[o]n April 25, 2005, the Company received a further notice from [the auditors] advising of a material weakness in the Company's internal controls in connection with the approval and consideration by appropriate personnel of all terms and conditions of the transaction and recommending that the Company implement controls relating to the approval and communication of all terms and conditions of all sales transactions." The notice continued:
The transaction consisted of a sale of approximately $1 million of Deconamine Syrup shipped and paid for in the third quarter. Based on information provided by the Company, [the auditor] has indicated its conclusion that the sale did not meet the criteria for revenue recognition after the customer expressed its intentions to return the product and the sale was modified in that the Company would accept all unsold product as of February 1, 2005, with credit granted against other trade amounts owed by the customer.
As a result of the non-recognition of revenue in the third quarter from this sale, the Company's consolidated statement of income for the third quarter of 2004 will need to be adjusted and restated to reduce net sales by $1,043,907 to $27,452,698, net income by $613,594 to $3,047,789, and diluted net income per common share by $0.03 to $0.18 and the Company's consolidated balance sheet as of September 30, 2004 will need to be adjusted and restated to record $1,043,907 of deferred revenue.
The SEC inquiry, Bradley's disclosures, and other financial and regulatory factors led to significant credit problems for the Company, and the need to obtain, at substantial expense, a new credit facility.
On January 27, 2006, Bradley filed its Annual Report on Form 10-K, including its audited financial statements, for the year ending December 31, 2004.
Plaintiff Carl Johnson filed his shareholder derivative action against Bradley's seven directors, a former director, and Bradley's Chief Financial Officer (CFO), Lenczycki on April 29, 2005. Johnson's complaint was followed by a similar complaint by plaintiff Jerry Foster on May 11, 2005. The matters were consolidated on July 19, 2005. Approximately one year after the initial filings, on May 12, 2006, plaintiffs filed an amended complaint adding *223 Bradley Glassman as a defendant. Defendants' motion to dismiss was filed on July 17, 2006. The motion was granted in a comprehensive and thoughtful opinion by Judge Ramona Santiago on October 30, 2006.

III.
Our review of Judge Santiago's decision is de novo on the record. The New Jersey Supreme Court, adopting language of the Supreme Court of Delaware, has stated:
Our review is not a deferential review that requires us to find an abuse of discretion. We see no reason to perpetuate the concept of discretion in this context. The nature of our analysis of a complaint in a derivative suit is the same as that applied by the Court of Chancery in making its decision in the first instance.
[PSE & G, supra, 173 N.J. at 287, 801 A.2d 295 (quoting Brehm, supra, 746 A.2d at 253).]
When we evaluate demand-futility, "`[p]laintiffs are entitled to all reasonable factual inferences that logically flow from the particularized facts alleged, but conclusory allegations are not considered as expressly pleaded facts or factual inferences.'" Id. at 287, 801 A.2d 295 (quoting Brehm, supra, 746 A.2d at 255).
We therefore turn to plaintiffs' amended complaint, which we note is derived from Bradley's press releases and regulatory filings, not from a review of Bradley's books and records, available to them under Delaware law, as we have previously noted, as well as under New Jersey precedent. See PSE & G, supra, 173 N.J. at 286, 801 A.2d 295.
As we have stated, plaintiffs' principal claims arise from Bradley's need to restate revenue, from actual to deferred, derived from the sale of Deconamine cough syrup in the third quarter of 2004, which plaintiffs alleged was a "sham" sale, designed to artificially inflate the Company's third quarter fiscal year 2004 financials. Additionally, the amended complaint alleged that through press releases and other filings commencing in October 2003, Bradley forecast an increase in net sales, net income and earnings per share, while failing to take into account the typical lifecycle of Bradley's products, which were generally unpatented, and thus subject to competition from generic drugs being introduced into the market. The complaint also alleged that during the period at issue, Bradley was materially overstating its financial results and failing to disclose adverse facts to the public, including actual or potential competition to Doak Dermatologics' prescription skin products, as well as facts regarding competition to Kenwood Therapeutics' product formulated to treat hemorrhoids. It was alleged that defendants, likewise, failed to timely disclose information that Bradley customers were returning large amounts of the hemorrhoid medication by the third quarter of fiscal year 2004 in anticipation of the arrival of comparable, but less expensive generic products entering the market in October 2004.
Liability was asserted in the amended complaint against CEO and Chair of the Board, Daniel Glassman; Daniel's wife, Treasurer and Board member, Iris; their son, non-Board member Bradley Glassman, Bradley's Vice-President, Sales and Marketing and allegedly the de facto head of the Kenwood subsidiary; and Vice-President and CFO Brent Lenczycki, a non-Board member. Additionally named as defendants were the remaining five outside members of the seven-member Board, serving at the time that suit was filed: (1) C. Ralph Daniel, III, a physician and clinical professor of dermatology at the University *224 of Mississippi; (2) Steven Kriegsman, Chairman of The Kriegsman Group, a financial services firm specializing in the development of alternative sources of equity capital for emerging growth healthcare companies, as well as President, CEO and director of CytRx Corporation, a biopharmaceutical company; (3) Alan Wolin, the Board's Secretary since February 2004 and an independent consultant to companies in the drug, food and cosmetic industries; (4) Andre Fedida (A.Fedida), a doctor of gastroenterology currently practicing in Newark, New Jersey and an assistant professor of medicine at Seton Hall University and Saint Michael's Medical Center; and (5) Michael Fedida (M.Fedida), a registered pharmacist with an ownership interest in multiple pharmacies. Finally, the amended complaint named as a defendant Daniel Bernstein, who was a member of the Board until his resignation, effective March 16, 2005, a date prior to the filing of either complaint. Until November 2004, Bernstein served as Chair of the Board's Audit Committee. He was replaced by Kriegsman as Chair of that Committee, upon which Wolin and A. Fedida also served. At relevant times, M. Fedida chaired the Company's Compensation Committee, which also included A. Fedida and Wolin.
Defendants' liability was premised on theories of defendants' alleged violations of state law, including breaches of fiduciary duties, abuse of control, gross mismanagement, waste of corporate assets, and unjust enrichment, occurring during the period between October 2003 and the filing of the amended complaint on May 12, 2006. The amended complaint stated that in committing the wrongful acts alleged, "the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design. In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breach of their respective duties." No specific conduct by any outside Board member was alleged.
In alleging demand futility, plaintiffs claimed that the Glassman family dominated and controlled the Board. The complaint stated:
Indeed, in its Form 10-K for FY:04 filed with the § on January 27, 2005, Bradley candidly admitted that the Glassman family "exercises substantial control" over Company affairs:

Our founder and Chairman of the Board, President and Chief Executive Officer exercises substantial control over our affairs,
At December 31, 2005, Daniel Glassman, our founder and Chairman of the Board, President and Chief Executive Officer, and members of his immediate family (including Iris Glassman and Bradley Glassman), were the beneficial owners of approximately 11% or 2,039,455 shares of our outstanding common stock, including the possible beneficial conversion of all outstanding shares of Class B common stock. The Class B common stock currently votes, as a class, to elect a majority of our board of directors, and has five votes per share or approximately 18% of the total voting power, with respect to all other matters on which our stockholders are entitled to vote other than the election of the board of directors. As a result Mr. Glassman exercises control over the election of our board of directors and significantly influences all of our corporate actions. The interests of Mr. Glassman and his family may differ from *225 yours and they may be able to take actions that advance their respective interests to your detriment. Mr. Glassman's ability to exercise control over the election of the board of directors may discourage, delay or prevent a merger or acquisition and could discourage any bids for our common stock at a premium over the market price.
[(Underscoring added in amended complaint.)]
Because of the Glassmans' alleged command of the Board's decision-making processes, including the establishment of basic Company policies and determining Board compensation, as well as Board retention, plaintiffs claimed, demand upon the Board members would be futile.
Additionally, plaintiffs relied for their claim of demand futility upon the marital relationship between Daniel and Iris Glassman, and the fact that A. Fedida and M. Fedida are brothers to suggest that none of the four would act independently. Further, plaintiffs alleged that the Board would not file suit against fellow Board members serving on the Compensation Committee because to do so would "jeopardize each defendant's personal financial compensation." They alleged as well that, as the result of the breach of fiduciary duty by the Audit Committee, a demand on its members would be futile, and that the Board as a whole could not act in a disinterested or independent fashion as the result of its participation in the wrongs alleged, and as a result of their potential liability arising from that participation. Thus, plaintiffs claimed, the Board would not sue itself.

IV.
In their brief, plaintiffs admit that they are not alleging any specific instances of action or inaction on the Board's part, and thus that our focus in analyzing demand futility should be on whether plaintiffs have established by particularized allegations that a reasonable doubt exists regarding the independence and disinterestedness of a majority of the members of the Board; more specifically, whether such a doubt exists that, at the time the complaint was filed, the Board could have "properly exercised its independent and disinterested business judgment in responding to a demand." Rales, supra, 634 A.2d at 934; see also Grimes v. Donald, 673 A.2d 1207, 1217 (Del.1996), overruled on other grounds, Brehm v. Eisner, 746 A.2d 244 (Del.2000) and Beam v. Stewart, 845 A.2d 1040, 1050 n. 26 (Del.2004) (discussing reasonable doubt standard). Our review of the amended complaint in this matter satisfies us that plaintiffs have failed to meet their burden to demonstrate both lack of independence and disabling interest.
For purposes of our analysis of independence and disinterest, we focus on the five persons who were members of the Board at the time of the filing of plaintiffs' original complaints, thereby assuming, without deciding, that neither Daniel Glassman nor his wife Iris was a disinterested Board member. Rales, supra, 634 A.2d at 934. To prevail, plaintiffs must demonstrate lack of independence or the presence of interest on the part of a majority of the Board. Brehm, supra, 746 A.2d at 257.
We first view allegations with respect to lack of independence, recognizing that "[i]ndependence is a fact-specific determination made in the context of a particular case." Beam, supra, 845 A.2d at 1049. In gauging independence, we must answer "independent from whom and independent for what purpose?" Id. at 1049-50.
*226 In their amended complaint, plaintiffs sought to demonstrate a lack of independence on the part of the Board by allegations of control of its members by Daniel Glassman and his family, relying in this regard on evidence of the Glassmans' substantial stock ownership and power to appoint the Board. However, Aronson demonstrates that:
Such contentions do not support any claim under Delaware law that the [ ] directors lack independence. In Kaplan v. Centex Corp., Del. Ch., 284 A.2d 119 (1971) the court of Chancery stated that "stock ownership alone, at least when it amounts to less than a majority, is not sufficient proof of domination or control." Id. at 123. Moreover, in the demand context even proof of majority ownership of a company does not strip the directors of the presumptions of independence. . . . There must be coupled with the allegation of control such facts as would demonstrate that through personal or other relationships the directors are beholden to the controlling person.
* * *
Thus, it is not enough to charge that a director was nominated by or elected at the behest of those controlling the outcome of a corporate election. That is the usual way a person becomes a corporate director. It is the care, attention and sense of individual responsibility to the performance of one's duties, not the method of election, that generally touches on independence.
[Aronson, supra, 473 A.2d at 815-16.]
See also Beam, supra, 845 A.2d 1040 (rejecting claims of lack of Board independence despite Martha Stewart's ninety-four percent control of her company and close personal friendships with Board members); Kenney v. Koenig, 426 F.Supp.2d 1175, 1185-86 (D.Colo.2006) (Del.law) (rejecting as insufficient to raise a reasonable doubt as to independence a corporate 10-K/A filing that admitted that a small number of shareholders could control corporate affairs). In the cases we have cited, as here, particularized allegations of control are simply lacking. We decline to infer that, because the Glassmans have admitted control over certain matters, they have rendered the five remaining Board members incapable of acting in the corporation's interest if called upon to do so. Lack of independence for the purpose of considering a shareholder demand for action against Bradley has not been alleged with requisite specificity.
In a demand futility context, a plaintiff charging dominion and control must "allege particularized facts manifesting `a direction of corporate conduct in such a way as to comport with the wishes or interests of the corporation (or persons) doing the controlling.'" Aronson, supra, 473 A.2d at 816 (quoting Kaplan v. Centex Corp., 284 A.2d 119, 123 (Del.Ch.1971)).
A controlled director is one who is dominated by another party, whether through close personal or familial relationship or through force of will. Orman v. Cullman, 794 A.2d 5, 25 n. 50 (Del.Ch.2002). A director may also be deemed "controlled" if he or she is beholden to the allegedly controlling entity, as when the entity has the direct or indirect unilateral power to decide whether the director continues to receive a benefit upon which the director is so dependent or is of such subjective material importance that its threatened loss might create a reason to question whether the director is able to consider the corporate merits of the challenged transaction objectively.
[Telxon Corp. v. Meyerson, 802 A.2d 257, 264 (Del.2002).]
*227 See also Grimes, supra, 673 A.2d at 1216 (stating that lack of independence can be established for demand futility purposes by allegations that the majority of the corporation's directors has a disabling financial or familial interest).
Here, no significant personal or business relationship was alleged between any of the five outside Board members whose independence we consider and the Glassmans.[5] Even if a personal or business relationship were demonstrated, for such a relationship to be significant, it must be of a "bias-producing" nature. Beam, supra, 845 A.2d at 1050. Here, nothing suggests such to be the case. Further, although it can be inferred that the Fedida brothers possess a personal relationship to each other, nothing set forth in the amended complaint suggests that, individually or together, the brothers maintained a disabling personal or business relationship with the Glassmans or that their familial bonds to each other would restrict their conduct.[6] The fact that relationships have developed between Board members as the result of their Board interactions is insufficient to create a reasonable doubt as to their lack of independence. Beam, supra, 845 A.2d at 1050-51.
In their complaint, plaintiffs alleged that the Board members received a benefit from Bradley as the result of Board membership in the form of a grant of stock options, yearly retainers, and meeting fees. Further, it was alleged that, following the initiation of the SEC inquiry, the Board members received relatively significant monthly fees for their additional work on the Audit Committee or otherwise as Board members. However, nothing in the complaint suggested that any of the Board members under consideration was dependent upon Board stipends and other remuneration, or regarded such compensation to be of "such subjective material importance that its threatened loss might create a reason to question" the Board member's independence. Telxon, supra, 802 A.2d at 264; White v. Panic, 793 A.2d 356, 366 (Del.Ch.2000), aff'd, 783 A.2d 543 (Del. 2001).
We find it of particular significance in this context to note that, although evidence is alleged in support of the claim that Daniel Glassman was aware of the modified sales agreement that permitted the return of the Deconamine syrup, no allegation established with any specificity that this information was in any fashion communicated by Glassman or his wife (assuming knowledge on her part) to the five other Board members. Moreover, upon being informed of the SEC's inquiry, the Board, and particularly, its Audit Committee, did act independently by retaining separate counsel to investigate Bradley's financial circumstances and in authorizing the retention of an independent auditing concern whose work eventually led to the discovery of the accounting problems surrounding the Deconamine transaction. Such conduct belies any inference of lack of Board independence that otherwise might arise. "Independence means that a director's decision is based on the corporate *228 merits of the subject before the board rather than extraneous considerations or influences." Aronson, supra, 473 A.2d at 816. The allegations of plaintiffs' amended complaint do not raise a reasonable doubt of the five Board members' independence in this case.
Having found no basis to reasonably doubt the Board's independence, we evaluate plaintiffs' allegations in support of their claim that the Board was incapable of acting in a disinterested fashion. In doing so, we note that plaintiffs are not relying upon a breach of fiduciary duty in connection with any specific action by the Board, thereby invoking consideration of Aronson's second prong. Rather, plaintiffs' claim is allegedly based either upon "general board action or lack of action." However, we are hampered in our analysis of the interest factor in this regard by a lack of specificity in the pleadings as to what "general action" is faulted or what the Board should have known or done but did not. See Guttman, supra, 823 A.2d at 498 (commenting upon a similar lack of specificity in an accounting impropriety context).
It has been stated that:
A director is considered interested where he or she will receive a personal financial benefit from a transaction that is not equally shared by the stockholders.[7] Directorial interest also exists where a corporate decision will have a materially detrimental impact on a director, but not on the corporation and the stockholders. In such circumstances, a director cannot be expected to exercise his or her independent business judgment without being influenced by the adverse personal consequences resulting from the decision.
[Rales, supra, 634 A.2d at 936 (citations omitted)].
Although the specter of personal liability may give rise to allegations of interest, the "mere threat" of such liability is insufficient to "challenge either the independence or disinterestedness of directors." Ibid. (quoting Aronson, supra, 473 A.2d at 815). A "substantial likelihood" that liability will eventuate is required. Rales, supra, 634 A.2d at 936; Guttman, supra, 823 A.2d at 503.
As plaintiffs note in their brief, the "sham" Deconamine transaction lies at the heart of the Company's alleged financial woes. It therefore follows that any liability on the part of the Board would most likely arise as the result of the failure of the Board to have recognized that the controls were not in place that would have prevented the sale in the form that it took, the manner in which it was accounted for, and its reporting to relevant authorities and the public. Board responsibility for breach of a duty to exercise care or for failure to monitor, the subject of a prior decision by the Chancery court in In re Caremark Int'l Derivative Litig., 698 A.2d 959 (Del.Ch.1996), has been deemed "possibly the most difficult theory in corporation law upon which a plaintiff might hope to win a judgment." Id. at 967. The Caremark court described a director's duty to oversee in the following terms:
[A] director's obligation includes a duty to attempt in good faith to assure that a corporate information and reporting system, which the board concludes is adequate, exists, and that failure to do so under some circumstances may, in theory *229 at least, render a director liable for losses caused by non-compliance with applicable legal standards.
[698 A.2d at 970 (footnote omitted).]
However, "the duty to act in good faith to be informed cannot be thought to require directors to possess detailed information about all aspects of the operation of the enterprise. Such a requirement would simpl[y] be inconsistent with the scale and scope of efficient organization size in this technological age." Id. at 971. Further, with respect to monitoring, "only a sustained or systematic failure of the board to exercise oversightsuch as an utter failure to attempt to assure a reasonable information and reporting system existswill establish the lack of good faith that is a necessary condition to liability. Such a test of liabilitylack of good faith as evidenced by sustained or systematic failure of a director to exercise reasonable oversightis quite high." Ibid.[8]
The amended complaint in this case discloses no facts upon which a conclusion could be reached that the five outside members of the Board breached their duties under Caremark's standard. As the Colorado District Court observed in Kenney when discussing similarly deficient pleadings:
All the plaintiffs' Amended Complaint and Response ostensibly demonstrates is that Carrier had an audit committee and the four independent outside director defendants were members of this committee during the period where the accounting improprieties occurred. That is not enough. Plaintiffs produce no evidence of the role, "if any, the Board or its members played in the internal processes of collecting and disseminating financial information." They aver no facts showing "how often" and "how long [the Audit Committee] met, who advised the committee, and whether the committee discussed and approved any of the allegedly improper accounting practices." Which specific oversight duties did the independent outside directors neglect? What specific action did these directors fail to take? What "specific redor even yellow flags were waved at the outside directors"? While plaintiffs claim to have alleged specific facts addressing these questions the Court can find none.
[426 F.Supp.2d at 1183].
The court's conclusions in Kenney are equally applicable here. Rather than pleading with specificity that there were red flags that should have alerted the outside members of the Board to Bradley's problems, the amended complaint suggests that Bradley had a functioning audit committee that responded appropriately when advised by the SEC that accounting and reporting violations might exist.
Plaintiffs' remaining allegations that outside Board members acted upon non-public information to which they had access and that they caused Bradley to issue press releases and file forms with the SEC are likewise insufficient to establish a substantial likelihood of liability on the part of the outside Board members, thereby rendering them unable to evaluate a shareholder's demand for action on the *230 corporation's behalf. The degree of specificity required in order to demonstrate demand futility is wholly absent from these conclusory statements. Further, we reject plaintiffs' argument that allegedly false statements with respect to Bradley's products and business prospects, issued under the names of Daniel Glassman and Lenczycki can be imputed to the Board for purposes of establishing a substantial basis for liability and thus lack of disinterest under Aronson. Unlike In re: Biopure Corp. Derivative Litigation, 424 F.Supp.2d 305 (D.Mass.2006) and In re Keyspan Corp. Sec. Litig., 383 F.Supp.2d 358, 387-88 (E.D.N.Y.2003), upon which plaintiffs rely, the statements did not concern the principal product of a company, about which the Board would be presumed to be knowledgeable. Although circumstances exist in which knowledge may be imputed to a board, see, e.g., In re: Abbott Labs. Derivative S'holders Litig., 325 F.3d 795 (7th Cir.2001) (involving continuing violations of Federal Food and Drug Administration (FDA) regulations over six years, accompanied by warning letters and meetings between the FDA and the Board Chair), the allegations of this case do not in any respect approach the level of notice required for such imputation to occur.
Further, unlike the defendants in In re Cendant Corp. Derivative Action Litig., 189 F.R.D. 117, 129 (D.N.J.1999), in the present case, the pendency of a securities class action in the Federal District Court for the District of New Jersey, In re Bradley Pharmaceuticals, Inc. Securities Litigation, does not provide material assistance to plaintiffs, since, as the decision denying dismissal of that action discloses, none of the independent Board members is a defendant in that action, which focuses solely on the conduct of Daniel and Bradley Glassman and Brent Lenczycki. 421 F.Supp.2d 822 (D.N.J.2006).[9]
As a final matter, we recognize that Delaware courts have consistently refused to find interest simply on the basis of an unparticularized allegation that a board will be unwilling to sue itself. See, e.g., Aronson, supra, 473 A.2d at 818 (calling this a "bootstrap argument"); Brehm, supra, 746 A.2d at 257 n. 34.
We therefore find, as well, that plaintiffs have failed to plead allegations of interest on the part of the independent Board members that would excuse a shareholder's demand as futile.

V.
As a final matter, plaintiffs contest Judge Santiago's determination to dismiss their amended complaint with prejudice. However, plaintiffs have not offered either a certification or a proposed amended pleading that would suggest their ability to cure the defects that we have noted with respect to the demand futility aspects of the present amended complaint. Cf. R. 4:9-1 (requiring that a motion for leave to amend have annexed to it a copy of the proposed amended pleading). Amendment remains a matter addressed to the court's sound discretion. Kernan v. One Washington Park, 154 N.J. 437, 457, 713 A.2d 411 (1998). Moreover, plaintiffs have already amended their complaint once, after the lapse of a year, without adding any material allegations relevant to the issue of demand futility. In the circumstances presented, in which a more rigorous pleading standard is imposed than the norm, we infer from plaintiffs silence with respect to *231 additional proposed allegations regarding demand futility, that provision of a further opportunity to amend would not be fruitful. We thus perceive no abuse of discretion on Judge Santiago's part in rejecting plaintiffs' request to re-plead and in dismissing their action with prejudice. Kanter v. Barella, 489 F.3d 170, 181 (3d Cir. 2007) (New Jersey law).
Affirmed.
NOTES
[1] The amended complaint names as defendants corporate officers Daniel Glassman, Iris Glassman, Bradley Glassman, and R. Brent Lenczycki, outside present directors C. Ralph Daniel, III, Steven Kriegsman, Alan Wolin, Andre Fedida, and Michael Fedida, and outside former director Michael Bernstein.
[2] New Jersey employs the same standards, and for that reason, no conflict of law is presented. See, e.g., R. 4:32-3 (previously, R. 4:32-5); PSE & G, supra, 173 N.J. at 279-82, 801 A.2d 295; Matter of Prudential Ins. Co. Litig., 282 N.J.Super. 256, 275, 659 A.2d 961 (Ch.Div.1995). Nonetheless, New Jersey precedent is less well developed than that of Delaware on the issues raised here.
[3] See also Brehm, supra, 746 A.2d at 256 (clarifying that Aronson's two prongs are to be viewed disjunctively).
[4] Such a circumstance would arise where the business decision was made by the corporate board, but a majority of its members had been replaced by the time of suit, where the subject of the suit is not a business decision by the board, or where the challenged decision has been made by the board of a different corporation. Rales, supra, 634 A.2d at 933-34.
[5] It is alleged that Board member Daniel was entitled to a "success fee" of $300,000 if he introduced a product licensing or merger or acquisition candidate that had not been internally identified by Bradley, and the Company availed itself of the opportunity presented. However, the complaint did not set forth whether the success fee had ever been earned or, if it had, the extent to which Daniel was financially dependent upon it.
[6] Although Fedida served on the Audit Committee, as we will discuss more fully, nothing has been alleged that would suggest substantial grounds for his liability, such that his brother would be reluctant to act against him.
[7] We emphasize that such a benefit must be material in the context of the director's economic circumstances so as to make it improbable that the director could perform his fiduciary duties without the influence of personal interest. Orman v. Cullman, 794 A.2d 5, 23 (Del.Ch.2002).
[8] This standard has been characterized by other courts as involving "gross negligence." Kenney, supra, 426 F.Supp.2d at 1182 (citing Seminaris v. Landa, 662 A.2d 1350, 1355 (Del. Ch. 1995)). The Guttman court has observed:

If gross negligence means something other than negligence, pleading it successfully in a case like this requires the articulation of facts that suggest a wide disparity between the process the directors used to ensure the integrity of the company's financial statements and that which would have been rational.
[823 A.2d at 507 n. 39.]
[9] We note that this theory was rejected by a federal judge in dismissing a similar shareholder derivative action on behalf of Bradley for failure to plead demand futility with sufficient particularity. See Perkins v. Daniel, Civil Action No. 06-cv-01518 (PGS), 2007 WL 4322596 (D.N.J. December 6, 2007) (slip op. at 10).