## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

PINE RIVER MASTER FUND LTD.  :
AND PINE RIVER FIXED INCOME  :
MASTER FUND LTD.,  :
                                                             :
            Plaintiffs,  :
                                                           :
            v.  :        **C.A. No. 2017-0145-JRS**
                                                             :
AMUR FINANCE COMPANY, INC.  :
AND AMUR FINANCE IV LLC,  :
                                                           :
            Defendants.  :

## MEMORANDUM OPINION

Date Submitted: September 12, 2017
Date Decided: October 12, 2017

C. Barr Flinn, Esquire, Emily V. Burton, Esquire, Lakshmi A. Muthu, Esquire and Meryem Y. Dede, Esquire of Young Conaway Stargatt & Taylor, LLP, Wilmington, Delaware and Michael M. Krauss, Esquire, Jane E. Maschka, Esquire and Michael F. Doty, Esquire of Faegre Baker Daniels LLP, Minneapolis, Minnesota, Attorneys for Plaintiffs.

Garrett B. Moritz, Esquire and Nicholas D. Mozal, Esquire of Ross Aronstam & Moritz LLP, Wilmington, Delaware and Christopher D. Kercher, Esquire, Julia M. Beskin, Esquire, Marlo A. Pecora, Esquire, and Thomas A. Bridges, Esquire of Quinn Emanuel Urquhart & Sullivan, LLP, New York, New York, Attorneys for Defendants.

**SLIGHTS, Vice Chancellor**

The parties to a collateralized loan transaction, Pine River Master Fund Ltd., Pine River Fixed Income Master Fund and Pine River Credit Relative Value Master Fund Ltd., as lenders, Amur Finance IV LLC ("Amur IV"), as borrower, Amur Finance Company, Inc. ("AFC"), as former administrative agent and Amur IV managing member, and Deutsche Bank Trust Company Americas, as collateral agent, have reached a breaking point in their relationship. The principal antagonists, the borrower and the lender, both maintain that the other is in dire financial straits and that this circumstance is driving the litigation positions being advanced in this Court. From the borrower's perspective, the lender is desperate to declare an Event of Default under the operative Credit Agreement so that it can seize assets pledged as collateral, monetize them and pay off its various investors. From the lender's perspective, the borrower is no longer able to meet its commitments under the Credit Agreement and yet is desperately clinging to the hope that its financial circumstances will improve in time to cure its many breaches before the Court enters a judgment declaring an Event of Default.

This opinion comprises chapter two of what is shaping up to be a litigation saga.[1] In chapter one, the Court concluded that the borrower had breached the Credit

---

[1] Chapter one: *Pine River Master Fund Ltd. v. Amur Fin. Co., Inc.*, 2017 WL 4023099 (Del. Ch. Sept. 13, 2017) (addressing alleged breaches of the Credit Agreement and alleged corresponding Events of Default) (hereinafter, "*Pine River I*").

Agreement but that no Event of Default had occurred.[2]  In this next chapter, the lender once again argues that the borrower has breached the Credit Agreement and that these breaches constitute Events of Default.[3]  The first set of alleged breaches relate to the borrower's failure to pay cash interest in accordance with the Credit Agreement's detailed provisions addressing such payments.  After attempting to construe these provisions, I have determined they are ambiguous and that extrinsic evidence is required before the Court can determine whether a breach has occurred.  The second breach relates to the borrower's distributions of cash to its parent out of an account created under the Credit Agreement, which the lender alleges has resulted in an unauthorized syphoning of loan collateral.  As to this latter claim, I am satisfied that the operative language of the contract is unambiguous, that the borrower is in breach and that the breach constitutes an Event of Default.  My reasoning follows.

## I.  BACKGROUND

In accordance with Court of Chancery Rule 56(c), I have drawn the facts from the pleadings, affidavits and documentary evidence appended to the motions.  I note

---

[2] *Id.*

[3] Not all of the breaches alleged in the Verified Amended Complaint were advanced here, suggesting that there is likely more dispositive motion practice to come.  The Court has advised the parties that they will have to join any remaining bases for partial or complete summary judgment in a single motion; the Court will not engage with the parties in serial partial dispositive motion practice.

that the Court has recited the background facts once before.[4]  The facts stated here are those relating to the motions *sub judice.*

## A. Relevant Parties

Plaintiffs are two Cayman Island exempted companies, Pine River Master Fund Ltd. and Pine River Fixed Income Master Fund Ltd. (together, "Pine River"). Pine River is the Lender under the Credit Agreement.[5]  Defendant, Amur IV, is a Delaware limited liability company with its principal place of business in White Plains, New York.  Amur IV is the Borrower under the Credit Agreement. Defendant, AFC, which served as Administrative Agent under the Credit Agreement until late 2016, is a Delaware corporation with its principal place of business in White Plains, New York.  AFC is the principal equity owner[6] and exclusive managing member of Amur IV.[7]

---

[4] *Pine River I.*

[5] All capitalized terms not expressly defined herein follow the definitions assigned in the Credit Agreement. Verified Supplemental and Am. Compl. ("Am. Compl.") Ex. A ("Credit Agmt.").

[6] Am. Compl. ¶ 2.

[7] *Id.* at ¶¶ 7, 39.

## B. Relevant Provisions of the Credit Agreement

The Secured Revolving Credit Agreement, dated August 5, 2013 (the "Credit Agreement"), provides Amur IV with an aggregate credit facility of $167,000,000 to be funded by Pine River (the "Pine River Loan" or the "Loan").[8]   Amur IV, in turn, committed to invest the borrowed funds in certain Operating Companies.  Pine River has alleged multiple breaches and corresponding Events of Default under the Credit Agreement.  At issue here are Amur IV's and AFC's alleged breaches of provisions relating to interest payments as well as Amur IV's alleged breach of provisions restricting borrower distributions.  I address the relevant provisions of the Credit Agreement (and a related Security Agreement) and then summarize the allegations of breach.

### 1.  The Waivers/Amendments and Integration Clauses

To prevent unintended changes to the highly negotiated Credit Agreement, the parties included a waivers and amendments provision in Section 9.02.  This provision requires any alterations to the Credit Agreement to be in a writing executed by all parties and further provides that the lender's delay or failure to assert rights under the agreement will not "operate as a waiver thereof."[9]  The Credit Agreement

---

[8] Credit Agmt., at pmbl.

[9] *Id.* at § 9.02(a).

also contains an integration provision in Section 9.06 in which the parties agreed that the Credit Agreement is the "entire contract among the parties relating to the subject matter . . . supersed[ing] any and all previous agreements and understandings."[10]

## 2. Cash Interest Accrual

Under the Credit Agreement, the Operating Companies make monthly payments to Amur IV (the "Available Collections") which are then deposited into the Collections Account.[11]  Available Collections are defined as:

> (i) all monies received, whether for earned interest, principal repayment or other amount, pursuant to the leases, loan agreements or other contracts constituting the Assets; (ii) any proceeds received from the sale of an Asset; (iii) any Default Proceeds, (iv) any earned interest with respect to the Accounts; and (v) any permitted withdrawals from the Accounts, including the positive difference between (a) the amount in the Reserve Account and (b) the Initial Reserve Amount or Required Reserve Amount, as applicable.[12]

The Credit Agreement, in turn, defines "Assets" (hereinafter, "Credit Agreement Assets") as:

---

[10] *Id.* at § 9.06 ("This Agreement constitutes the entire contract among the parties relating to the subject matter hereof and supersedes any and all previous agreements and understandings, oral or written, relating to the subject matter hereof.").

[11] *Id.* at § 6.02 ("'Collections Account.' On the Closing Date, the Borrower will establish a Collections Account (the 'Collections Account'). Available Collections for the related Collection Period shall be deposited to the Collections Account to be distributed on each Payment Date according to the priority of payments set forth in Section 6.04.").

[12] *Id.* at § 6.02.

commercial or industrial equipment, capital leases and operating leases, loans, or other financial assets acquired by the Borrower, as initially set forth on Schedule 3 [to the Credit Agreement], as such Schedule may be amended from time to time, and any proceeds thereof.[13]

Once Available Collections are deposited into the Collections Account, the Administrative Agent is tasked with preparing an Administrator Report that lists the distribution of Available Collections under the prescribed Waterfall as set forth in the Credit Agreement at Section 6.04.[14]  The Administrator Report identifies, *inter alia*, the amount of Cash Interest Accrual, or monthly cash interest, Amur IV is obligated to pay to Pine River for that particular Interest Period, which the Credit Agreement defines as a calendar month.  This obligation is listed under the Fifth priority of the Waterfall, a higher priority than distributions Amur IV is permitted to make to its affiliates.[15]

---

[13] *Id.* at § 1.01 (Assets definition).

[14] *Id.* at § 6.03.

[15] *Id.* at § 6.04.  The provisions of the Waterfall set forth the following relevant payment priorities:

> Fifth, to each Lender, accrued and unpaid Cash Interest Accrual on its respective Loan, including past-due and current Cash Interest Accrual, *pro-rata* if not all Cash Interest Accrual may be paid;
>
> Sixth, to each Lender, Additional Interest if any, due on its Loan, *pro-rata* if not all Additional Interest may be paid;
>
> Eighth, to repay outstanding principal of Loans to the extent of PIK Accrual amounts then outstanding (including PIK accrual previously capitalized);

Amur IV's obligation to pay Cash Interest Accrual implicates several provisions of the Credit Agreement. To begin, Section 2.08 requires Amur IV to pay cash interest to Pine River each month.[16] Section 2.08(a) sets out the formula used to calculate the total interest owed,[17] while Section 2.08(b) requires Amur IV to "immediately pay [] in cash . . . the lesser of (i) the accrual calculated pursuant to [Section 2.08(a)] or (ii) 75% of the aggregate Stated Return Minimum Cash Calculation for all Assets during such Interest Period."

In order to ascertain which of the amounts set forth in Section 2.08(b) is the "lesser" amount that is immediately due to Pine River, the Administrative Agent must determine the value of the Stated Return Minimum Cash Calculation ("SRMCC"). At Section 1.01, the Credit Agreement defines the SRMCC as "the

---

Ninth, when, after giving effect to a payment made hereunder and in the absence of a Default or an Event of Default, the equity of the Borrower will be at least 17.5% of its capital, and the cash equity of the Borrower will be at least 10.0% of its capital, any dividends and distributions to the Parent which the Borrower may declare;

Twelfth, to the Borrower (including disbursement to the Borrower of any amounts in the Reserve Account).

[16] *Id.* at § 2.08(b) (defining "[t]he amount of [] accrual which is immediately payable in cash as Interest upon the Loans").

[17] Section 2.08(a) defines the interest accruing during each Interest Period as "(A) the Weighted Average Stated Rate Yield of all Assets held during such Interest Period multiplied by (B) the average Loans outstanding in such Interest Period divided by (C) twelve, less (ii) the Administrative Fee and Collateral Agent Fee, each to the extent accruing in such Interest Period."

sum of all amounts of cash required to be paid to [Amur IV] during [the] Interest Period as determined from all Stated Return Schedules related to Assets held during such Interest Period less the Asset Operating Fee."[18] The "Stated Return Schedule," referenced in the SRMCC definition, is defined under the Credit Agreement as a schedule that is created by the Administrative Agent and disclosed to Pine River when an investment in an Operating Company is proposed.[19] Its purpose is to:

> set[] forth for each Interest Period in which the Asset is anticipated to be held [] the amount of cash expected to be returned to the Borrower, including the Net Proceeds for any sale of the proposed Asset . . . [and] disclose Stated Yield, Stated Rate Yield and Stated Spread. The Stated Return Schedule of an Asset shall not be changed absent manifest calculation error. For the avoidance of doubt, the underperformance or over-performance of an Asset shall not permit the Stated Return Schedule to be altered.[20]

Under the Credit Agreement, any failure to pay the Cash Interest Accrual due constitutes an Event of Default upon which Pine River can accelerate the entirety of

---

[18] In addition to its relevance in the calculation of the Cash Interest Accrual, Pine River takes account of the SRMCC of a particular proposed investment when it considers whether to make an additional advance. *See* Credit Agmt., at § 4.02(f) (providing that advances will be made after "[e]ach Lender is satisfied in its sole discretion that (i) each Asset to be acquired with the proceeds of the Advance meets Asset Criteria, (ii) the calculations of Stated Yield, Stated Rate Yield and Stated Return Minimum Cash Calculation are reasonable and (iii) the Participation Accrual provisions are appropriately disclosed and consistent with the related Program").

[19] *Id.* at § 1.01 (Stated Return Schedule definition).

[20] *Id.*

the Loan.[21]  As discussed below, Pine River alleges that Amur IV has failed to pay

Cash Interest Accrual as directed by the Administrative Agent and that this failure

constitutes an Event of Default.[22]

### 3. The Restricted Payments

The Credit Agreement provides a means to protect Pine River's investment

by requiring Amur IV to maintain a prescribed "equity cushion."[23]  Specifically,

Section 4.02(e) provides:

> [a]fter giving effect to the acquisition of the Assets to be acquired on
> such Drawdown Date, the Borrower shall provide evidence that the
> amount of equity held by the equity holders of the Borrower complies
> with the Equity Ratio. If the Borrower will not be in compliance with
> the Equity Ratio when delivering the Borrowing Notice [five business

---

[21] *Id.* at § 7.01.  Under Sections 7.01 (a) and (b) of the Credit Agreement, an Event of Default occurs if:

> (a) [Amur IV] shall fail to pay any Interest on any Loan when and as the same shall become due and payable, and such failure shall continue unremedied for a period of sixty (60) days;

> (b) [Amur IV] shall fail to pay any Interest on any Loan when and as the same shall become due and payable (without giving effect to any grace period provided under Section 7.01(a)) on two or more Payment Dates.

*See also id.* at § 7.02(a) (granting Pine River the right to accelerate the entire Loan upon an Event of Default under particular sections, including Sections 7.01(a), (b) and (f)).

[22] Additionally, Pine River asserts that AFC has breached Sections 2.08(b) and 6.04 by failing to calculate and direct payment of Cash Interest Accrual when it acted as Administrative Agent.  Am. Compl. ¶ 279.

[23] Credit Agmt., at § 4.02(e); Am. Compl. Ex. C. ("December 2014 Amendment") at § 1(d) (Section 4.02 Amendment).

days prior to an advance], Borrower shall receive from its equity holders an equity investment in cash or in kind (through the contribution of assets or investments of equivalent cash value), in sufficient amount to achieve compliance with the Equity Ratio after giving effect to the acquisition of the Assets to be acquired on such Drawdown Date. The Lenders will not be obligated to make the requested Advance until they is satisfied that (i) Parent has complied with any such request for investment, (ii) the Borrower will be in compliance with the Equity Ratio subsequent to receiving such Advance and acquiring the related Asset and (iii) the form of the equity contributed to the Borrower has been adequately disclosed to the Lenders and any equity contribution made other than in cash has been made in compliance with any transfer restrictions and is fully paid and non-assessable.[24]

The "Equity Ratio," in turn, is defined as:

an amount of equity in the Borrower held by its equity holders equal to (i) not less than 7.5% of the Borrower's Total Assets until such time as the Class A members have received any dividends' or distributions upon the Class A Units of the Borrower or from Excess Proceeds (other than any distribution made pursuant to Section Il(a) of the LLC Agreement of the Borrower in the form to which it was amended on December [ ], 2014 (the 'LLC Agreement')), or (ii) from and at all times after such Class A equity holders have received any dividend or distribution upon the Class A Units of the Borrower or from Excess Proceeds (other than any distribution made pursuant to Section 11(a) of the LLC Agreement), 17.5% of Borrower's Total Assets.[25]

While a breach of Section 4.02(e) alone will not lead to an Event of Default, the prescribed equity cushion in Section 4.02(e) animates certain of the Credit Agreement's restrictions with respect to Loan Collateral. Pine River alleges that

---

[24] December 2014 Amendment, at § 1(d) (4.02(e) Amendment).

[25] *Id.* at § 1(c) (Equity Ratio Amendment).

Amur IV has breached these restrictions causing an Event of Default. Specifically, Pine River alleges that Amur IV has made certain unauthorized distributions to AFC that have disrupted the equity cushion. In this regard, the Credit Agreement, by its terms, protects the equity cushion from depletion through Section 5.07(d) which imposes restrictions on distributions "in respect of [the borrower's] equity interests" and Section 5.07(f) which imposes restrictions on certain related-party transactions involving the borrower.

Under Section 5.07(d), Amur IV is restricted from making "distributions in respect of its equity interest . . . other than any . . . payment[s] permitted to be made to [the] Parent in accordance with Section 6.04 [the Waterfall]."[26] Such payments to the Parent are authorized deep into the Waterfall in the Ninth priority.[27] Section 5.07(d) was amended in 2014 to allow Amur IV to make dividend distributions to AFC, but only if Amur IV satisfied four designated conditions:

> (i) no Event of Default has occurred and is continuing or may result as a consequence of such dividend being paid, (ii) such dividend is permitted under Section 11 of the LLC Agreement, or in a different or successor provision of such LLC Agreement to which each Lender has furnished its consent; (iii) all Interest which accrued in the most recently completed Interest Period was paid in cash, and (iv) an officer of the Borrower certifies to the Lenders that he or she has reasonably

---

[26] Credit Agmt., at § 5.07(d).

[27] *Id.* at § 6.04.

determined that the Borrower will be able to pay in cash all Interest which will accrue in the current and next Interest Periods.[28]

Section 5.07(f) further limits Amur IV by requiring that a transaction with an Amur IV affiliate be "no less favorable to [Amur IV] than those that would have been obtained by [Amur IV] in . . . an arm'[s]-length [transaction]." Additionally, Amur IV must deliver to Pine River a resolution of its board stating that the transaction does "not adversely affect the interests of [Pine River]."[29]

Section 7.01(f) provides that a breach of Section 5.07 constitutes an Event of Default.[30] Pine River alleges that Amur IV's breaches of Section 5.07(d) and Section 5.07(f) are separate breaches, either of which should be deemed to have triggered Section 7.01(f).

### C. The Security Agreement

The Security Agreement was executed by the parties alongside the Credit Agreement. The two agreements advance the joint goal of securing Pine River's investment.[31] Under Section 2.02 of the Credit Agreement, Amur IV grants Pine

---

[28] December 2014 Amendment, at § 1(e) (Section 5.07(d) Amendment).

[29] Credit Agmt., at § 5.07(f).

[30] *Id.* at § 7.01(f) (providing that an Event of Default occurs under the Credit Agreement if Amur IV "fail[s] to observe or perform any covenant, condition or agreement contained in Article V [Covenants]. . . .").

[31] The Security Agreement's Preliminary Statement explains the relationship of the parties in reference to both Agreements: "The Grantor is owner of the Collateral, and will derive substantial benefit from the transactions contemplated by the Credit Agreement and the

River a security interest in the Loan Collateral as defined in the Security Agreement.[32]  Thus, under Section 2.01 of the Security Agreement, which defines Collateral, Pine River holds a security interest in:

> (a) all right of the Grantor in and to the Interest Reserve Account, the Collections Account and each other Account established under the Credit Agreement, (b) all cash, investment property, investments, securities, instruments, investment property or other property (including all 'financial assets' within the meaning of Section 8-102(a)(9) of the UCC) at any time or from time to time on deposit in or credited to any such Account, (c) all of the Assets and all rights to payment and other Proceeds from time to time received, receivable or otherwise distributed in respect of such Assets, (d) all income, payments and proceeds of any and all of the foregoing, and (e) all other Assets of the Grantor, wherever located and whether now owned or hereafter acquired or arising, and all proceeds thereof, in each case for the benefit of the Secured Parties (the 'Collateral').[33]

> Assets (hereinafter, "Security Agreement Assets"), as defined in the Security Agreement, are:

---

Related Documents. [] It is a condition precedent to the making of the Loans by the Lenders that the Grantor grant the security interests required by this Agreement." *See also* Credit Agmt., at § 2.02 ("The Borrower grants to the Collateral Agent, for the benefit of the Lenders, free and clear of all other Liens (other than Permitted Liens), a first priority perfected lien on and security interest in the Collateral. The Collateral shall secure the Loans and other amounts owing from Borrower to Lenders or other parties hereunder on the terms herein.").

[32] Credit Agmt., at § 2.02; *id.* at § 1.01 ("'Collateral' shall have the meaning set forth in the Security Agreement"); *id.* at Preliminary Statement (Amur IV pledged "all of its assets" to the lenders and granted a security interest in those assets as Collateral for the Loan).

[33] Security Agmt., at § 2.01.

all right, title and interest of Grantor in and to the following property with each term having the definition provided in Article 9 of the UCC: accounts, chattel paper, commercial tort claims, consumer goods, deposit accounts, documents, equipment, farm products, general intangibles, instruments, inventory, investment property, letter of credit rights, letters of credit and money, whether now owned or hereafter acquired (including without limitation the Assets set forth on Schedule 3 to the Credit Agreement).[34]

Thus, any Amur IV Assets, and "all proceeds thereof," as set forth in the Security Agreement, are "Collateral" which Amur IV pledged to Pine River under Section 2.02 of the Credit Agreement to secure the Pine River Loan.

## D. The Alleged Breaches of the Credit Agreement

On February 23, 2017, Pine River filed a Verified Complaint (the "Original Complaint") in which it seeks declaratory judgments with respect to various breaches of the Credit Agreement as well as relief from future breaches and money damages. As noted, in its latest motion for partial summary judgment, Pine River seeks declarations from the Court that Amur IV or AFC breached the Credit Agreement in two respects: (1) Amur IV breached Section 2.08 by failing to pay accrued interest when due and AFC breached Section 6.04 by failing to direct such payments as Administrative Agent; and (2) Amur IV breached Section 5.07 by making unauthorized distributions of roughly $94,000 to AFC out of the Collections Account on a near monthly basis since the inception of the parties' relationship.

---

[34] *Id.* at § 1.01 (Assets definition).

14

## 1. The Alleged Underpayment of Cash Interest

The dispute over cash interest payments was apparently sparked by the parties' Stipulation and Order Resolving Pine River's Anticipated Motion for Preliminary Injunction entered by the Court on April 25, 2017 (the "April 25 Order").[35] The April 25 Order, which resolved a motion for preliminary injunction filed by Pine River, required Lighthouse Management Group, Inc. ("Lighthouse"), in its role as Administrative Agent,[36] to prepare the Administrator Reports according to the Credit Agreement (with certain agreed upon modifications pending resolution of this dispute). In generating the June 2017 Administrator Report, Lighthouse took a fresh look at the Cash Interest Accrual calculation and concluded that AFC, during its time as Administrative Agent, had been calculating it incorrectly, in particular with respect to its calculation of the SRMCC.

According to Lighthouse, the Credit Agreement requires the Administrative Agent to determine the SRMCC by combining "all amounts" owed to Amur IV in the Interest Period.[37] "All amounts," according to Lighthouse's interpretation,

---

[35] DI 68.

[36] Pine River had previously exercised its right to remove AFC as Administrative Agent. Aff. of Patrick Finn ("Lighthouse Aff.") ¶ 5; Am. Compl. ¶ 19.

[37] *See* Lighthouse Aff. ¶ 15 (explaining how Lighthouse reached the conclusion that the cash interest due from Amur IV would be interest calculated under Section 2.08(a) referencing one particular loan program which had passed its maturity date but remained largely unpaid). In reaching this conclusion, Lighthouse focused on the following phrase within the definition of SRMCC: "'Stated Minimum Cash Calculation' means for any

15

includes all principal and interest, whether due or past due, that the Operating Companies owe to Amur IV.[38]  Thus, to calculate the SRMCC, Lighthouse determined that it must identify and total all outstanding and due payments reflected on the Stated Return Schedule with respect to each Asset.[39]  This marked a departure from how AFC, as Administrative Agent, had been calculating SRMCC from the outset of the parties' relationship.  Specifically, AFC had calculated SRMCC by referring to projected returns as set forth in the Stated Return Schedules.  This approach yielded a steady, predictable SRMCC for each loan program.

Lighthouse's approach to calculating SRMCC resulted in substantially higher Cash Interest Accrual numbers.[40]  Specifically, after applying its calculation of SRMCC, Lighthouse determined that the amount calculated under Section 2.08(b)(ii) (75% of the SRMCC) would exceed the interest owed under

---

Interest Period the sum of ***all amounts of cash required to be paid*** to the Borrower during such Interest Period . . . ."  Credit Agmt., at § 1.01 (emphasis supplied).

[38] Lighthouse Aff. ¶ 15.

[39] *See id.* at ¶¶ 13, 15; Aff. Lakshmi A. Muthu Transmitting Ex. to Pls.' Br. in Opp'n to the Defs.' Mot. and in Supp. of Pls.' Cross-Mot. to Enforce the Court's Apr. Order and for Partial Summ. J. on Related Claims ("Muthu Aff.") Ex. 12, at 4.

[40] For June 2017 Lighthouse directed Amur IV to pay $1,956,167.19; for July 2017 $1,959,148.81; for August 2017 $1,980,270.54.  Lighthouse Aff. ¶¶ 22, 24–25. The June 2017 calculation was later changed to $1,957,151.09 to reflect an error which had resulted in the addition of interest earned on the Collections Account to the Cash Interest Accrual. *Id.* at 6.

16

Section 2.08(a) (the total interest owed).[41]  Accordingly, Lighthouse concluded that the cash interest due from Amur IV was the interest as calculated under Section 2.08(a).[42]

Amur IV disagreed with Lighthouse's calculation, performed its own calculation under Section 2.08(b)(ii), and distributed $635,717.30 in June 2017. According to Amur IV, its calculation for June 2017 was consistent with calculations performed by AFC and accepted by Pine River since the inception of their relationship.[43]  The July and August Administrator Reports sparked similar disputes: in July, Lighthouse requested payment of $1,960,109.97 under Section 2.08(a) and

---

[41] Lighthouse Aff. ¶ 15.

[42] *Id.*  To illustrate its calculation, Lighthouse pointed to one Amur IV investment, a $12 million loan program to PMC Aviation 2012-1 LLC, where the loan to PMC had matured in August 2016 but PMC still owed Amur IV a substantial amount of principal and interest.  *Id.*  Based on the outstanding balance of this loan alone, Lighthouse determined that 75% of the SRMCC was more than the interest due under Section 2.08(a). *Id.*

[43] Defs.' Br. in Supp. of their Mot. to Enforce  the Court's Apr. 25, 2017 Order ("Defs.' Br. in Supp. of Mot. to Enforce") 12.  In June 2016, the Cash Interest Accrual stated on the Administrator Report was $635,717.30.  Muthu Aff. Ex. HH.  The Administrator Reports for July 2016 through May 2017 stated Cash Interest Accrual payments due in the same amount.  *Id.* at Ex. II-18/D.  This amount equals 75% of Amur IV's SRMCC that AFC consistently calculated by taking the sum of all "Stated Min Cash" columns included on the Stated Return Schedule for each program.  Defs.' Br. in Supp. of Mot. to Enforce 9. These columns, according to Amur IV, are determined at the outset of each investment program and represent the program's expected cash returns to Amur IV for each month during the life of the program.  *Id.*

Amur IV distributed $375,412.95;[44] in August, Lighthouse directed payment of $1,980,157.57[45] and Amur distributed $635,717.30.[46]

### 2. The $94k Distributions

Starting in 2013, Amur Equipment Finance, Inc. ("Axis") paid out a dividend (the "Dividends" or the "Axis Dividends") to Amur IV on roughly a monthly basis by depositing $94,327.75 *into* the Collections Account established by the Credit Agreement.[47] These deposits were quickly followed by a withdrawal (the "$94k distributions") in roughly the same amount *out of* the Collections Account by Amur IV and a corresponding distribution to AFC. This, according to Pine River, occurred in 44 months since the parties entered into the Credit Agreement,[48] and amounted to deposits of $4,430,076.50 and withdrawals of $4,241,421.00.[49]

Lighthouse noticed the $94k distributions out of the Collections Account when it began to compile and review records supplied by AFC during the transition

---

[44] Lighthouse Aff. ¶ 22.

[45] *Id.* at ¶ 24 n.6.

[46] *Id.* at ¶ 25.

[47] *Id.* at ¶ 27, Ex. E.

[48] *Id.* at ¶¶ 26–27, Ex. E.

[49] *Id.* at ¶ 27 (the discrepancy reflects that 47 deposits were made but only 44 distributions went to AFC).

from AFC to Lighthouse as Administrative Agent.[50]  Lighthouse asked AFC and

Amur IV to explain these monthly transactions.[51]  In response, Amur IV explained

that the $94k distributions were dividends on Axis preferred stock (the "Axis

Preferred Stock") owned by Amur IV.[52]  It further explained that while Amur IV

owned the Axis Preferred Stock, the Dividends flowed to AFC in accordance with

an agreement between AFC and Amur IV that had been blessed by Pine River.

Specifically, the parties had agreed that AFC would contribute the Axis Preferred

Stock to Amur IV so Amur IV could reach the Equity Ratio required by the Credit

Agreement while AFC would retain the right to receive any dividends declared by

Axis on its preferred stock.[53]

According to Amur IV and AFC, the parties' agreement with regard to the

treatment of the Dividends and the $94k distributions is entirely consistent with the

Credit Agreement.[54]  In this regard, Amur IV points out that Credit Agreement

---

[50] *Id.* at ¶ 26.

[51] *Id.*

[52] *Id.*; Defs.' Corrected Reply Br. in Supp. of Their Mot. to Enforce and in Opp'n to Pls.'
Mot. for Partial Summ. J. ("Defs.' Reply Br.") 37.

[53] Credit Agmt., at § 4.02(e).

[54] Curiously, after Pine River advised Amur IV that it viewed the $94k distributions as
serial breaches of the Credit Agreement, Amur IV did not deposit the Dividend into or
distribute the $94k distribution out of the Collections Account in July or August 2017.
Lighthouse Aff. ¶ 28.  Amur IV explains that this was due to Axis' decision not to declare
a dividend in July and August 2017.  Defs.' Reply Br. 37; Corrected Aff. of Mostafiz

19

Assets are only those assets "acquired by" Amur IV.[55] Since Amur IV did not acquire the Dividends, but instead held them for AFC, the rightful owner, they were not Credit Agreement Assets. As such, the Dividends cannot be deemed "Available Collections" that would be subject to distribution out of the Collections Account in accordance with Section 6.04's Waterfall and, accordingly, they are not subject to the provisions of the Credit Agreement.[56] Additionally, Amur IV argues that the Dividends are not part of the Loan Collateral as defined by Section 2.01 of the Security Agreement since they are not "owned" by Amur IV.[57] For the same reason, Amur IV asserts that the Dividends are not a Security Agreement Asset securing the Loan since Amur IV does not have "all right, title and interest" in the Dividends.[58]

---

ShahMohammed in Supp. of Defs.' Mot. to Enforce and in Opp'n to Pls.' Mot. for Partial Summ. J. ("ShahMohammed Aff.") ¶ 17.

[55] Credit Agmt., at § 1.01.

[56] Transcript of the September 12, 2017, Oral Argument, DI 132, ("Tr.") 49–51 ("[T]he preferred equity dividends are not 'Available Collections' . . . the 'Collections Account' definition doesn't contemplate them and they don't flow through the Section 6.04 waterfall . . . So the preferred equity dividends are not contemplated by the credit agreement."); Defs.' Reply Br. 5 ("[T]hese dividends are not Available Collections under the Credit Agreement and therefore do not flow through the priority of payment waterfall of section 6.04.").

[57] Tr. 117–18 (Amur IV explaining that the section encompasses only those assets "owned [by Amur IV] or hereinafter acquired.").

[58] *Id.* at 118 ("Amur IV did not have right, title or interest in the Axis preferred equity dividends.").

Pine River maintains that Amur IV's characterization of the $94k distributions collides with the clear terms of the Credit Agreement and Security Agreement at every turn. *First*, the notion that Amur IV can simply transfer to AFC dividends earned on preferred equity that AFC and Amur IV have committed to meet the Equity Ratio (required by the Credit Agreement to secure the Pine River Loan) finds no support in the language or spirit of Section 4.02(e).[59] In this regard, Pine River argues that Amur IV's reliance upon the definition of Credit Agreement Assets as justification for the $94k distributions is misplaced. According to Pine River, it is not arguing that the Dividends are a Credit Agreement Asset and, thus, must be distributed as part of Available Collections under Section 6.04's Waterfall.[60] Rather, Pine River is simply arguing that the Dividends are part of the Loan Collateral and, accordingly, Amur IV is prohibited from making the $94k distributions to AFC

---

[59] Credit Agmt., at § 4.02(e) (providing that "the Borrower shall provide evidence" of compliance with the Equity Ratio). Amur IV asserts that only the Axis Preferred Stock was transferred to satisfy the Equity Ratio and not the Dividends. Tr. 114. Amur IV supports its claim that the stock alone was sufficient to meet the requirement by explaining that the Axis common stock initially contemplated to be transferred (agreed to by Pine River) would not have yielded a dividend. *Id.*; Defs.' Reply Br. 36. Furthermore, Amur IV asserts that the Axis Preferred Stock alone is sufficient equity, even without the Dividend, because Pine River could foreclose on the stock and thereby receive the face value of the shares of approximately $8 million. Tr. at 117.

[60] Tr. 61 ("The argument that Amur makes about how these are (capital 'A') Assets or not (capital 'A') Assets doesn't matter. We're not trying to argue that they needed to be distributed through the waterfall.").

under Sections 5.07(d) and (f).[61] According to Pine River, the Axis Preferred Stock is a Security Agreement Asset and, under Section 2.01 of the Security Agreement defining Collateral, is part of the Collateral for the Loan.[62] The Dividends, as "proceeds" of the Axis Preferred Stock, even if not a Security Agreement Asset, still remain a key component of that Collateral.[63] Since Sections 5.07(d) and 5.07(f) of the Credit Agreement are meant to prevent Amur IV from depleting the Collateral, these sections must be read to prevent the $94k distributions.

*Second*, as for Amur IV's argument that a side agreement between the parties authorized the $94k distributions, Pine Rive contends that Amur IV has conveniently overlooked Sections 9.02 and 9.06 of the Credit Agreement.[64] Section 9.06's

---

[61] *Id.* at 58 (explaining that the language of Section 5.07(d) does not apply only to Credit Agreement Assets but rather limits Amur IV in making any distributions "of any property belonging to [Amur IV]"); *see also id.* at 60 (Pine River explaining that Amur IV could retain the Dividends without violating the Credit Agreement but cannot distribute the Dividends to AFC without meeting the requirements of Section 5.07); Pls.' Reply Br. 30 ("Sections 5.07(d), (f) and 6.04 prohibited Amur IV from depleting that equity cushion by distributing value to AFC or any other affiliate.").

[62] *See id.* at 59–60.

[63] Security Agmt., at § 2.01(a) (defining "Collateral" broadly to include "all other Assets of the Grantor, wherever located and whether now owned or hereafter acquired or arising, and all proceeds thereof, in each case for the benefit of the Secured Parties . . ."); Tr. 61 ("[T]he proceeds of all of the debtor's property are also part of the collateral for the Pine River loan.").

[64] Tr. 63–64 (explaining how both Sections 9.02 and 9.06 would prevent a separate agreement concerning the Dividends and $94k distributions as argued by Amur IV).

integration clause does not allow for side agreements;[65] and Section 9.02's waiver and amendments clause requires all agreements that would amend the Credit Agreement to be in writing and prohibits either party from arguing that the other has waived rights under the Credit Agreement by not previously asserting them.[66]

## E. Procedural Posture

Pine River's Original Complaint contained seven counts in which it sought various declaratory, injunctive, and monetary relief. The Court entered the April 25 Order, on the stipulation of the parties, to resolve Pine River's applications for preliminary injunctive relief.[67] The April 25 Order required Lighthouse to prepare the monthly Administrator Report and Amur IV to follow the directions in those reports. When the parties disagreed as to the cash interest due to Pine River as calculated in the June Administrator Report, on July 26, 2017, Amur filed a motion to enforce the April 25 Order.[68] On August 18, 2017, Pine River filed a cross-motion to enforce the April 25 Order and a motion for partial summary judgment on

---

[65] *Id.* at 64 ("So if there was an oral agreement—Pine River doesn't agree that there was one—but if there were an oral agreement, it would be superseded by Section 5.07(d) or, if Amur prefers, 5.07(f).").

[66] *See id.* (pointing to Am. Compl. Ex. B, C ("Waiver and Amendment No. 1;" "Amendment No. 2") as evidence that the parties recognized that amendments to the Credit Agreement must be in writing signed by all parties).

[67] DI 68.

[68] DI 100.

Count VIII (relating to Cash Interest Accrual) and Count IX (relating to the $94k distributions) of its Verified Amended Complaint which was e-filed on August 21, 2017.[69] The Court heard the cross-motions to enforce and Pine River's motion for partial summary judgment on September 12, 2017.

## II. ANALYSIS

Pine River's motion seeks a summary declaration that Amur IV and AFC have breached the Credit Agreement by failing to pay interest when due and that Amur IV is in breach for making the unauthorized $94k distributions. It also seeks declarations that these breaches constitute Events of Default. I address the merits of the motion below after briefly reciting the well-settled standards by which the Court must review a motion for summary judgment in which the movant seeks a declaration of rights under a contract.

### A. Standard of Review

Pursuant to Court of Chancery Rule 56(c), the Court will grant summary judgment when "there are no questions of material fact and the moving party is entitled to judgment as a matter of law."[70] When considering a motion for summary judgment in the context of contract construction, the threshold question is whether

---

[69] The Amended Complaint is dated August 18, 2017, but was not e-filed until August 21, 2017. *See* Am. Compl.; DI 107.

[70] *Senior Tour Players 207 Mgmt. Co. LLC v. Golftown 207 Hldg. Co., LLC*, 853 A.2d 124, 126 (Del. Ch. 2004).

24

the contract is ambiguous.[71]  This is a question of law the answer to which may not be reached through the consideration of extrinsic evidence.[72]

"A contract is ambiguous if the language used lacks a definite and precise meaning, and there is a reasonable basis for a difference of opinion."[73]  "Where a contract is ambiguous, the interpreting court must look beyond the language of the contract to ascertain the parties' intentions."[74]  Thus, if the court finds a contract term ambiguous, "its construction presents a question of fact that may not be resolved by the court on a motion for summary judgment."[75]

---

[71] *Vitullo v. New York Cent. Mut. Fire Ins. Co.*, 51 N.Y.S.3d 768, 770 (N.Y. App. Div. 2017).  While the Credit Agreement contains a New York choice of law provision at Section 9.09, Delaware and New York apply the same general contract principles and thus Delaware law is instructive here. *See Viking Pump, Inc. v. Century Indem. Co.*, 2 A.3d 76, 90 (Del. Ch. 2009).

[72] *Vitullo*, 51 N.Y.S.3d at 770 ("A contract may be enforced summarily where its terms are unambiguous.  Whether a contract is ambiguous is a question of law[,] and extrinsic evidence may not be considered unless the document itself is ambiguous.  Furthermore, extrinsic and parol evidence is not admissible to create an ambiguity in a written agreement which is complete and clear and unambiguous on its face.").

[73] *Agor v. Bd. of Educ.*, 981 N.Y.S.2d 485, 487 (N.Y. App. Div. 2014).

[74] *GMG Capital Invs., LLC v. Athenian Venture P'rs I, L.P.*, 36 A.3d 776, 780 (Del. 2012) (internal quotation omitted).

[75] *Shadlich v. Rongrant Assocs., LLC*, 887 N.Y.S.2d 228, 229 (N.Y. App. Div. 2009).

Finally, since "[t]here is no 'right' to summary judgment,"[76] the court may deny summary judgment in its discretion "if it decides upon a preliminary examination of the facts presented that it is desirable to inquire into and develop the facts more thoroughly at trial."[77] As it relates to contract construction, the "more thorough development" of the facts necessarily translates into the development and presentation of extrinsic evidence.[78]

## B. Cash Interest Accrual

The construction exercise required to determine whether Amur IV has breached Section 2.08 by failing to pay cash interest, and whether AFC has breached Section 6.04 by directing that payments be made inconsistently with the prescribed Waterfall, begins, of course, with Section 2.08. According to Section 2.08(b), "[t]he amount . . . which is immediately payable in cash as Interest [each month] upon the Loans," defined as "Cash Interest Accrual," is the lesser of the Interest as calculated under Section 2.08(a) or "75% of aggregate Stated Return Minimum Cash

---

[76] *In re El Paso Pipeline P'rs, L.P. Deriv. Litig.*, 2014 WL 2768782, *9 (Del. Ch. June 12, 2014) (citing *Telxon Corp. v. Meyerson*, 802 A.2d 257, 262 (Del. 2002)).

[77] *Id.* (citing *Cerberus Int'l, Ltd. v. Apollo Mgmt.*, 794 A.2d 1141, 1150 (Del. 2002)).

[78] *GMG Capital Invs.*, 36 A.3d at 783 ("[W]here reasonable minds could differ as to the contract's meaning, a factual dispute results and the fact-finder must consider admissible extrinsic evidence.").

Calculation for all Assets during such Interest Period."[79] The interest as calculated under Section 2.08(a) is the total interest owed.[80] To ascertain which is the "lesser" amount as between accrued Interest in Section 2.08(a) and 75% of the SRMCC, one must calculate the accrued Interest and compare that to the calculated SRMCC for all Assets during any given month (the "Interest Period").

To calculate the SRMCC, one must look to "the sum of all amounts of cash required to be paid to the Borrower during such Interest Period as determined from all Stated Return Schedules related to Assets held during such Interest Period."[81] The Stated Return Schedule is defined as:

> a schedule reasonably prepared by the Administrative Agent for a proposed Asset, and disclosed to the Lenders in the related Borrowing Notice, which sets forth for each Interest Period in which the Asset is anticipated to be held and the amount of cash expected to be returned to the Borrower, including the Net Proceeds for any sale of the proposed Asset. Such cash flows shall be divided between the cash required to be paid to the Borrower pursuant to the contractual terms of the Asset, and all other cash flows, including cash flows to be realized upon the sale of the proposed Asset. The Stated Return Schedule shall also disclose Stated Yield, Stated Rate Yield and Stated Spread. The Stated Return Schedule of an Asset shall not be changed absent manifest calculation error. For the avoidance of doubt, the underperformance or over-

---

[79] Credit Agmt., at § 2.08(b).

[80] *Id.* at § 2.08(a) (providing that the interest owed is based on the Weighted Average Stated Rate Yield of the Assets as defined in Section 1.01).

[81] *Id.* at § 1.01 (SRMCC definition).

performance of an Asset shall not permit the Stated Return Schedule to be altered.[82]

An exemplar "Borrowing Notice," referenced in the definition of Stated Return Schedule, is attached to the Credit Agreement as Exhibit A. On its face, it is clear that this notice is intended to be delivered to Pine River at the time of a "Proposed Borrowing" under the Credit Agreement.[83] The intended timing of the delivery of the Borrowing Notice and accompanying Stated Return Schedule, in turn, suggests that the purpose of the Stated Return Schedule is to project the performance of an Asset at the outset of a "Proposed Borrowing" rather than to track the performance of the Asset as an evolving document during the course of the borrowing. This construction is consistent with the references within the definition of Stated Return Schedule to the effect that its purpose is to provide the Lender with a schedule of "the amount of cash *expected* to be returned to the Borrower" during the timeframe in which the Asset is "*anticipated* to be held" by the Borrower.[84]

The definition of Stated Return Schedule goes on to provide that the schedule "shall not be changed absent manifest error" and further states, "[f]or the avoidance of doubt, the underperformance or over-performance of an Asset shall not permit the

---

[82] *Id.* at § 1.01.

[83] *Id.* at Ex. A.

[84] *Id.* at § 1.01 (Stated Return Schedule definition).

Stated Return Schedule to be altered."[85]  Together, this language appears to reflect an intent that the Stated Return Schedule is to be a one-time projection of sorts prepared by the Administrative Agent at the front-end of a Proposed Borrowing. Under this construction, AFC's reliance upon the projected returns of an Asset to calculate SRMCC would appear to be reasonable.

The parties have provided several exemplar Stated Return Schedules in the summary judgment record.[86] Each of these schedules contains a column designated "Stated Min Cash" which, according to Amur IV, is shorthand for SRMCC.[87]  The amounts reflected in this column appear to reflect steady, consistent projections of performance throughout the anticipated life of the loan.[88]  Amur maintains that it is from these projected SRMCC numbers that the Administrative Agent must

---

[85] *Id.*

[86] *See* Defs.' Br. in Supp. of Mot. to Enforce Ex. 24–28.

[87] *See id.*; Defs.' Reply Br. 17; ShahMohammed Aff. ¶ 23.

[88] *See, e.g.*, Defs.' Br. in Supp. of Mot. to Enforce Ex. 25 (containing a "Stated Min Cash" column that projects returns of $80,000.00 from May 31, 2014 (apparently the initiation of that particular program) through June 25, 2019, at which time the amount jumps to $146,666.67 for one month and then declines to $0 on the 64th payment date (the end of the 64-month term investment)); *see also id.* at Ex. 27 (showing a "Stated Min Cash" column setting forth returns of $151,070 for August 2013, $150,989 for September 2013, $149,790 for October 2013, slowly decreasing to $1,255 in February 2015, and then finally reflecting a projection of $0 for the remainder of the 18 months ending in August 2016).  I note that it is impossible to tell from the Stated Return Schedules in print format which investment program the schedule pertains to.  *See, e.g.*, *id.* at Ex. 24, 27.

determine the Cash Interest Accrual to be paid every month, just as AFC has done (without objection from Pine River) throughout the parties' relationship.[89]

Pine River offers a different construction. It contends that the Stated Return Schedules, on their face, reflect the parties' intent to create an evolving document that tracks the performance of the Assets and reveals, in actual (not projected) terms, "the sum of all amounts of cash required to be paid to the Borrower during such Interest Period."[90] By doing so, the Stated Return Schedules allow an actual, not projected, calculation of SRMCC. Specifically, according to Pine River, the Stated Return Schedules permit the Administrative Agent to calculate in real time the principal and interest payments due from the Operating Companies to the Borrower.[91] This, according to Pine River, is consistent with the definition of

---

[89] Defs.' Br. in Supp. of Mot. to Enforce 9–10 ("[The] Stated Return Minimum Cash Calculation is calculated by simply adding the figures in the "Stated Min Cash" column in each Program's Stated Return Schedule for such month, across all the relevant fundings. This is how the Stated Return Minimum Cash Calculation has been derived since the inception of the Credit Agreement, and correspondence with Pine River dating back to 2013 reflects that all parties understood that the figures in the "Stated Min Cash" column for the Stated Return Schedules were the proper and sole inputs for arriving at the Stated Return Minimum Cash Calculation.").

[90] Credit Agmt., at § 1.01 (definition of SRMCC).

[91] Tr. 83 (Pine River explaining that "[t]hose payments of principal and interest are all shown on the stated return schedules"); *see also* Native Excel Files of Certain Ex. Filed with Defs.' Br. in Supp. of Mot. to Enforce Apr. 25, 2017 Order ("Defs.' Excel File CD") (showing excel versions of the Stated Return Schedules presented by Defendants in the exhibits to their Motion to Enforce). The Stated Return Schedule exhibits presented to the Court on Defs.' Excel File CD, include tabs as part of the Stated Return Schedules reflecting, among other figures, amounts for interest due, interest paid and principal paid.

SRMCC, which requires the calculation to account for "*all* amounts of cash required to be paid to the Borrower . . . ."[92]

Amur's construction of the SRMCC and Stated Return Schedule definitions is reasonable. There is no clear indication in either definition that the parties intended SRMCC to be determined based on the actual performance of an Asset. The definition of Stated Return Schedule, as noted above, can be read to suggest that the schedule is to provide a projection of performance which, in turn, suggests that the SRMCC, "determined from the Stated Return Schedule," is likewise intended to be based on projected, not actual, performance.

Pine River's interpretation of the definition of SRMCC is also reasonable and supported by the Stated Return Schedules submitted with the parties' motion papers. These schedules appear to reflect the actual "sum of all amounts of cash required to

---

*See, e.g.*, *id.* at Ex. 24. For example, the "Amur Aviation Return Schedule," labeled as Exhibit 24 on the CD, includes four tabs as part of its Excel booklet named "Stated Minimum Cash Sheet," "Funding1," "Funding2" and "Repayment." *Id.* The Repayment tab includes columns for interest due, interest paid as well as principal due and paid columns. *Id.* Similarly, the "PMC Return Schedule," labeled Exhibit 27 on the CD, displays three tabs, one of which is labeled "Schedule" while the others are labeled "PMC-767 (Assets)" and "PMC-767 (Liab)." *Id.* at Ex. 27. The "Schedule" tab, again, includes a column for interest and principal in addition to the "Stated Min Cash" column. *Id.* The PMC-767 (Liab) tab shows amounts for interest, reserve and principal payments updated throughout the life of the loan to reflect those payments due and paid as well as a column named "cash out" for each of the categories. *Id.* Based on these exemplars, it would appear that the Stated Return Schedules contain more than simply projections prepared at the outset of a borrowing.

[92] Credit Agmt., at § 1.01 (emphasis supplied).

be paid to the Borrower during [any given] Interest Period."[93]  The Stated Return

Schedules are expressly incorporated within the definition of SRMCC.  The

schedules themselves, therefore, are not extrinsic to the Credit Agreement.[94]  Thus,

they cannot be ignored when determining who, as between AFC and Amur IV or

Lighthouse, correctly calculated the SRMCC.

Because I have determined that both parties have offered reasonable

constructions of the relevant provisions of the Credit Agreement relating to potential

breaches of Sections 2.08 and 6.04, I must conclude that the Credit Agreement is

---

[93] *Id.* at § 1.01 (SRMCC definition).

[94] *I.U. N. Am., Inc. v. A.I.U. Ins. Co.*, 896 A.2d 880, 886 (Del. Super. 2006) ("The general rule of contractual interpretation referred to as the doctrine of incorporation by reference is: Other writings, or matters contained therein, which are referred to in a written contract may be regarded as incorporated by the reference as a part of the contract and therefore, may properly be considered in the construction of the contract.  Where a written contract refers to another instrument and makes the terms and conditions of such other instrument a part of it, the two will be construed together as the agreement of the parties.") (internal quotation omitted); *In re Bd. of Comm'rs of Washington Park*, 52 N.Y. 131, 134 (N.Y. 1873) ("It is most usual to annex papers designed to be incorporated in an instrument by a reference, and a simple reference to a paper thus annexed will suffice without more particular description, and, if referred to as annexed, and is not annexed, the defect cannot be supplied by parol.  Neither is there any particular mode of reference to a paper, whether annexed or not, essential to make it a part of the chief or principal instrument.  Any language which clearly indicates the intention of the parties or the maker of the instrument to that effect, will suffice, within the well-established rule which calls upon courts to give effect to the intent as indicated by the words employed by parties.").

ambiguous with respect to these provisions.[95] Thus, I must deny summary judgment as to Count VIII.[96]

[95] *GMG Capital*, 36 A.3d at 780 ("[A]n ambiguity exists when the provisions in controversy are fairly susceptible of different interpretations or may have two or more different meanings. Where a contract is ambiguous, the interpreting court must look beyond the language of the contract to ascertain the parties' intentions.") (internal quotation omitted). I acknowledge that both parties argue that the other's construction of the operative provisions, if accepted, would yield "absurd results." According to Amur, Pine River's SRMCC calculation would allow a lone Asset's default to trigger an Event of Default for Amur IV that could not be cured due to limitations on the circumstances under which AFC can make equity contributions under the Credit Agreement. Under this construction, Amur IV would be paying an "above-market interest rate of 15% while simultaneously taking on the burden of guaranteeing the performance of each Asset." Amur also claims that, under Pine River's interpretation, the over-performance of an Asset could lead to negative SRMCC and to Amur IV's principal increasing while "by all logic it should be decreasing." Defs.' Reply Br. 4, 28–29, 34–35. For its part, Pine River contends that "[u]nder Amur's interpretation, Pine River could not declare an Event of Default even if Amur IV owed Pine River $160 million, with principal increasing by more than $1 million monthly, and Amur IV made no payments to Pine River—for years . . . ." This is because, "[u]nder Amur's interpretation, although PMC [for example] is currently required to pay Amur IV more than $9 million, with more than $6.5 million in missed payments reflected on PMC's Stated Return Schedule, Pine River [would have] no recourse for a recovery of the funds [it] advanced for PMC [until the maturity of the Loan in 2023]." Pls.' Reply Br. 16–17. To be sure, it is a settled tenet of contract construction that the court should not construe a contract in a manner that produces an "absurd result." *In re IBP, Inc. S'holder Litig.*, 789 A.2d 14, 57 (Del. 2001) ("New York law disfavors a reading of a contract that produces capricious and absurd results, in favor of a reading that is reasonable in the commercial context in which the parties were contracting."). Even so, neither party has proffered a result that would flow from the court's acceptance of the other party's construction that is any more or less "absurd" than the result that would flow from its own construction. Stated differently, in the "absurd results" sweepstakes, both parties are winners or losers, depending upon one's perspective.

[96] *Shadlich*, 887 N.Y.S.2d at 229 ("When the language of a contract is ambiguous, its construction presents a question of fact that may not be resolved by the court on a motion for summary judgment."). Since Pine River's claim that AFC has breached Section 6.04 is dependent upon a finding that Amur IV breached Section 2.08, and I have found

## C. Section 5.07 and the $94k Distributions

An assessment of Pine River's claim that Amur IV is in breach of the Credit Agreement by having made the $94k distributions, once again, requires a rather tedious perambulation through several provisions of the contract.[97] At the heart of the claim are Sections 5.07(d) and (f). These sections serve to protect the Collateral for the Pine River Loan from depletion by restricting Amur IV's ability to make distributions "in respect of its equity interests" as well as its ability to engage in transactions with its affiliates.[98] Pine River has invoked both provisions to support its claim of breach.

---

ambiguity in that section, the determination of whether AFC is in breach of Section 6.04 must await the Court's construction of Section 2.08.

[97] I note that Pine River has asserted a claim of breach of Section 4.02 in Count IX for Amur IV's alleged failure to maintain the Equity Ratio prescribed by the Credit Agreement. Am. Compl. ¶¶ 291–92, 296, 298. I need not reach this claim given my findings regarding Pine River's claim that Amur IV has breached Section 5.07.

[98] *See* Credit Agmt., at § 5.07(d) ("Restricted Payments: The Borrower shall not and shall cause its Subsidiaries not to [m]ake any distributions in respect of its equity interests or directly or indirectly purchase redeem, or otherwise acquire or retire any of its equity interests . . . other than any such payment permitted to be made to Parent in accordance with Section 6.04."); *id.* at § 5.07(f) (restricting Borrower from "mak[ing] any transaction, contract, agreement, understanding, loan, advance or guarantee with or for the benefit of any Affiliate of Borrower" except "on terms that are no less favorable to Borrower than those that would have been obtained by Borrower in a comparable transaction on an arm's length basis . . ."). Amur argues that Pine River did not preserve its arguments under Section 5.07(f) in its briefs and, therefore, has waived them. Defs.' Br. in Opp'n 41. I disagree. First, I note that Count IX in the Amended Verified Complaint, filed on August 21, 2017, expressly put Amur on notice that Pine River was alleging a breach of Section 5.07(f). Am. Compl. ¶¶ 294, 296; DI 106–07. Pine River then invoked

## 1. Section 5.07(d)

Section 5.07(d), by its terms, restricts the transfer of Amur IV's "equity interests."[99] It is undisputed that Amur IV owns the Axis Preferred Stock from which the $94k distributions originate.[100] As such, the distributions are "distributions in respect of [Amur IV's] equity interests."[101]

Two provisions modify the restrictions set forth in Section 5.07(d). *First*, Section 5.07(d) contains a carve-out for payments "permitted to be made to Parent in accordance with Section 6.04." Since the $94k distributions were made by Amur IV to its parent, AFC, it is appropriate to consider whether Section 6.04 authorizes these distributions. A review of the unambiguous terms of Section 6.04 reveals that it does not. Section 6.04 permits the Borrower to make payments to its Parent under the Ninth priority of the Waterfall, after the higher priorities, including Interest, have been paid.[102] There is no dispute that the $94k distributions were made

Section 5.07(f) in its opening brief at page 32, and again in its reply brief at pages 29 through 31. There was no waiver.

[99] Credit Agmt., at § 5.07(d).

[100] ShahMohammed Aff. ¶ 13; Tr. 46, 50.

[101] Credit Agmt., at § 5.07(d). Amur IV maintains the $94k distributions were actually "distributions in respect of Axis's equity interests." Defs.' Reply Br. 40. While it is true that the payment of the Dividends from Axis to Amur IV were in respect of Axis's equity interests, the $94k distributions from Amur IV to AFC were payments made "in respect of" Amur IV's equity interests.

[102] Credit Agmt., at § 6.04.

before the other priorities in the Waterfall were satisfied.[103] They were not, therefore, permitted by Section 6.04.

*Second*, Section 5.07(d) was amended in December 2014 to provide that Amur IV could pay dividends to AFC, even if not "permitted" by Section 6.04, but only if Amur IV satisfied four designated conditions: "(i) no Event of Default has occurred and is continuing or may result as a consequence of such dividend being paid, (ii) such dividend is permitted under Section 11 of the LLC Agreement, or in a different or successor provision of such LLC Agreement to which each Lender has furnished its consent; (iii) all Interest which accrued in the most recently completed Interest Period was paid in cash, **and** (iv) an officer of the Borrower certifies to the Lenders that he or she has reasonably determined that the Borrower will be able to pay in cash all Interest which will accrue in the current and next Interest Periods."[104] It is undisputed that neither condition (iii) nor condition (iv) were satisfied prior to

---

[103] Payment of PIK Accrual is due under the Eighth priority of the Waterfall. Amur IV has, through its arguments concerning the calculation of cash interest due, already asserted that it has not previously paid all PIK Accrual. *See, e.g.*, Tr. 20 (Amur arguing that "Pine River knew it was going to receive certain amounts of money in cash and that the rest of Amur [IV]'s debt service would be satisfied through the addition of any difference . . . as PIK accrual. So it is not that Pine River would not receive its money; it would just receive it at a different point in time in the form of essentially compound interest."). Thus, the priorities due before the Ninth priority, under which the distributions to AFC could have been properly made, were not satisfied prior to the payment of the $94k distributions.

[104] December 2014 Amendment, at § 1(e) (Section 5.07(d) Amendment) (emphasis supplied).

the $94k distributions to AFC.[105]  Thus, Amur IV cannot employ the amendment to Section 5.07(d) to justify the distributions.

The $94k distributions were not authorized and, in fact, were prohibited by Section 5.07(d).  Thus, absent some other justification for the distributions, Amur IV has breached the Credit Agreement by making them.

### 2. Section 5.07(f)

As noted, under Section 5.07(f), Amur IV may not enter into a "transaction" with its affiliates unless it can demonstrate that the transaction is on terms comparable to an arms-length transaction.[106]  In addition, Amur IV must deliver to Pine River a board resolution reflecting that the transaction "does not adversely

---

[105] The Credit Agreement defines "Interest" as "the sum of Additional Interest, PIK Accrual and Cash Interest Accrual."  Credit Agmt., at § 1.01.  Defendants in their Brief in Support of their Motion to Enforce explain that Pine River will still receive the amount it is owed under Amur IV's theory but will receive it in PIK Accrual rather than cash interest within each month.  Based on Amur IV's argument, one can deduce that PIK Accrual was not paid in cash in prior months and has not been certified to be paid in future months.  Since Interest, under the Credit Agreement, includes PIK Accrual, Amur IV has not paid in cash all Interest in the months preceding the $94k distributions.  Credit Agmt., at § 1.01.  Section 5.07(d)(iii), as amended, requires all Interest to be paid in cash in the prior month and Section 5.07(d)(iv), as amended, requires certification that Amur IV will be able to pay all Interest in cash in the current and next period.  Amur IV does not dispute that these provisions were not satisfied and thus the December 2014 Amendment allowing additional distributions cannot justify the $94k distributions.  Defs.' Br. in Supp. of Mot. to Enforce 27, 29–30.

[106] Black's Law Dictionary (10th ed. 2014) (defining "transaction" as "[t]he act or an instance of conducting business or other dealings" and noting that the term "is a broader term than contract").  I am satisfied that the monthly distributions are "transactions" as that term is used in Section 5.07(f).

affect the interests of the Lenders" and that it is, in fact, on terms comparable to an arms-length transaction.[107] It is undisputed that no such board resolutions were delivered to Pine River with respect to the $94k distributions to AFC.[108] Nor did Amur IV ever attempt to demonstrate that the $94k distributions were on terms "that are no less favorable to [Amur IV] than those that would have been obtained by [Amur IV] in a comparable transaction on an arm's-length basis with a [non-affiliate]."[109] Thus, the $94k distributions violated Section 5.07(f) as well.

### 3. The Alleged Separate Agreement Relating to the Axis Dividends

Staring in the face of a clear breach of Section 5.07, Amur IV maintains that the Credit Agreement does not apply to the $94k distributions because Amur IV reached an understanding with Pine River that the Dividends, from which the distributions originate, belong to AFC, not Amur IV. According to Amur IV, the

---

[107] Credit Agmt., at § 5.07(f).

[108] ShahMohammed Aff. ¶¶ 13, 16–17 ("AFC's transfer of the **preferred shares** to Amur IV was approved by resolutions of the Board of AFC and of the sole member of Amur IV." (emphasis supplied). "It was my understanding that we had reached agreement with Pine River and the matter [of routing the Dividends through the Collections Account] was settled." "To the best of my knowledge, Axis dividends were routed to AFC by way of the Collections Account from the inception of the Credit Agreement—when Pine River and I agreed to this approach—until Pine River objected, for the first time, in June of 2017."); Tr. 47 (Amur's counsel stating that "Pine River has been aware of these dividends . . . [through its receipt of] quarterly financial disclosures evidencing the payment . . . [and] collections account bank statements," thus indicating that no Amur IV board resolutions concerning the $94k distributions were ever presented to Pine River).

[109] Credit Agmt., at § 5.07(f)(i).

Credit Agreement accounts for this arrangement in its definition of Assets and Available Collections and Pine River blessed the payments to AFC in a separate, binding oral agreement between Pine River and Amur IV prior to entering the Credit Agreement.

Credit Agreement Assets are "commercial or industrial equipment, capital leases and operating leases, loans, or other financial assets acquired by the Borrower, as initially set forth on Schedule 3 [to the Credit Agreement], . . . and any proceeds thereof."[110]  Amur IV maintains that since it never "acquired" the Axis Dividends, they cannot be deemed a Credit Agreement Asset subject to distribution under the Credit Agreement.[111]  According to Amur IV, this construction is consistent with Schedule 3 to the Credit Agreement, which purports to list all Credit Agreement Assets at the time of the Credit Agreement's execution but does not list the Axis Dividends.[112]  Thus, having demonstrated that the Dividends are not a Credit Agreement Asset, Amur IV argues that they are not part of the Available Collections and, thus, the Credit Agreement does not apply to them.[113]

---

[110] *Id.* at § 1.01 (Assets definition).

[111] Amur IV also argues that the Axis Dividends do not become a Credit Agreement Asset simply because they were deposited into the Collections Account.  Tr. 52.

[112] *Id.* at 50–51.

[113] *Id.* at 51 ("[T]he preferred equity dividends are not contemplated by the credit agreement.").

Even assuming that Amur IV is correct and the Dividends are not a Credit Agreement Asset, that determination, standing alone, does not take Amur IV where it needs to go to defeat Pine River's claim of breach under Section 5.07. Nothing in Section 5.07 remotely suggests that its transfer and distribution restrictions apply only to transfers of Amur IV's Assets as defined under the Credit Agreement.[114] Instead, these provisions are "negative covenants" that restrict Amur IV's ability to engage in conduct that might diminish Pine River's security, including by diminishing the Collateral that has been pledged for the Loan. "Collateral" is defined in the Credit Agreement by reference to the Security Agreement,[115] which, in turn, defines Collateral as:

---

[114] Credit Agmt., § 5.07(d) (Borrower shall not "[m]ake *any* distributions in respect to its equity interests . . .") (emphasis supplied); *id.* at § 5.07(f) (Borrower shall not "make *any payment* to or sell, lease, transfer or otherwise dispose of *any of its properties or assets* to, or purchase any property or assets from, or enter into or make or amend any transaction, contract, agreement, understanding, loan, advance or guarantee with, or for the benefit of, any Affiliate of Borrower . . .") (emphasis supplied).

[115] At oral argument, Amur maintained that Pine River's "argument with respect to Section 2.01 was not briefed, and [Amur] respectfully submit[s] that it is not appropriate for [Pine River] to make new arguments related to Section 2.01 of the security agreement now." Tr. 117. Once again, I disagree. Pine River briefed the argument in its Reply Brief on page 30 in response to Amur's suggestion that the Dividend belonged to AFC:

> Pine River underwrote the Credit Agreement based on the equity cushion. Sections 5.07(d), (f) and 6.04 prohibit Amur IV from depleting that equity cushion by distributing value to AFC or any other affiliate. Moreover, Pine River receives the benefit of a security interest in the Axis Stock to protect its rights; that security interest covers not only the Axis preferred stock, but also all proceeds of and income from the Axis Stock, including all Axis Dividends received by Amur IV. (Security Agreement § 2.01 (a)).

40

(a) all right of the Grantor in and to the Interest Reserve Account, the Collections Account and each other Account established under the Credit Agreement, (b) all cash, investment property, investments, securities, instruments, investment property or other property (including all 'financial assets' within the meaning of Section 8-102(a)(9) of the UCC) at any time or from time to time on deposit in or credited to any such Account, (c) all of the Assets and all rights to payment and other Proceeds from time to time received, receivable or otherwise distributed in respect of such Assets, (d) all income, payments and proceeds of any and all of the foregoing, and (e) all other Assets of the Grantor, wherever located and whether now owned or hereafter acquired or arising, and all proceeds thereof, in each case for the benefit of the Secured Parties (the 'Collateral').[116]

Security Agreement Assets, in turn, are defined as:

all right, title and interest of Grantor in and to the following property with each term having the definition provided in Article 9 of the UCC: accounts, chattel paper, commercial tort claims, consumer goods, deposit accounts, documents, equipment, farm products, general intangibles, instruments, inventory, investment property, letter of credit rights, letters of credit and money, whether now owned or hereafter acquired (including without limitation the Assets set forth on Schedule 3 to the Credit Agreement).[117]

As noted, it is undisputed that Amur IV owns the Axis Preferred Stock.[118]

Accordingly, Amur IV has "all right, title and interest" in that equity and it is,

---

*See also* Defs.' Br. in Opp'n to Pls.' Mot. for Partial Summ. J. ("Defs.' Br. in Opp'n") 37 (raising the issue of Amur IV's ownership of and interest in the Axis Dividend).

[116] Security Agmt., at § 2.01 (emphasis supplied).

[117] *Id.* at § 1.01.

[118] Tr. 44 (Amur explaining that the "preferred shares were transferred to Amur IV in order to satisfy the equity ratio"); ShahMohammed Aff. ¶¶ 13–14 ("The transfer of the preferred shares to Amur IV was approved by resolutions of the Board of AFC and the sole member

therefore, a Security Agreement Asset.[119]  As a Security Agreement Asset, the Axis

Preferred Stock is part of the Collateral securing the Loan under Section 2.01(a) of

the Security Agreement.[120]  It follows from that determination that the Dividends

derived from that stock, even if not themselves a Security Agreement Asset, are

Collateral under Section 2.01(a)(e), which provides that Collateral includes "all

other Assets of [Amur IV], wherever located and whether now owned or hereafter

acquired or arising, ***and all proceeds thereof***." [121]  More succinctly stated, the

Dividends are "proceeds" of the Axis Preferred Stock and thus are Collateral for the

Pine River Loan.  Therefore, the Credit Agreement's provisions, including the

---

of Amur IV."); Defs.' Reply Br. 39 n.100 ("AFC transferred [the Axis Preferred Stock] to Amur IVI to maintain Amur IV's Equity Ratio.").

[119] Security Agmt., at § 1.01 (Assets definition).

[120] ShahMohammed Aff. ¶ 7 (explaining that the stock to be transferred to Amur IV was intended to be "part of the asset contribution used to satisfy the Equity Ratio as well as part of the collateral in which Pine River ha[s] a security interest").

[121] *Id.* at § 2.01(a)(e);  *see also* Credit Agmt., pmbl.:

> The Borrower agrees and acknowledges that each Lender is agreeing to make Advances to Borrower on the terms set forth herein with an initial aggregate Commitment Amount of One Hundred Sixty-Seven Million US Dollars ($167,000,000.00) as of the Closing Date, and Borrower shall apply the proceeds of Advances solely as set forth herein, and the Borrower shall in consideration for such Advances *pledge all of its assets to*, and grant a first priority perfected Lien on all of such assets as Collateral for the Loans and any other obligations hereunder, to the Collateral Agent for the benefit of the Lenders (emphasis supplied).

negative covenants set forth in Sections 5.07(d) and (f), are applicable to the $94k distributions.

As for Amur IV's contention that it reached a separate oral agreement with Pine River that modified the Credit Agreement, the argument fails to account for the parties' clear intent, as expressed in the Credit Agreement, that no such oral agreements will modify the parties' fully integrated written agreement. To be sure, as a general matter, a written agreement "does not exclude proof of a parol collateral agreement made even between the same parties."[122]  When a written contract is meant to embody the whole agreement of the parties and covers the subject matter of the alleged collateral agreement completely, however, such proof of a collateral agreement is not admissible.[123]  Such is the case here.

As an initial matter, the Credit Agreement requires Amur IV to hold certain equity as security for the Loan prior to and following any advance from Pine River

---

[122] *Thompson Bros. Pile Corp. v. Rosenblum*, 993 N.Y.S.2d 353, 354 (N.Y. App. Div. 2014).

[123] *Id.*; *see also Mitchill v. Lath*, 160 N.E. 646, 647 (N.Y. 1928) ("Under our decisions, before such an oral agreement as the present is received to vary the written contract, at least three conditions must exist: (1) The agreement must in form be a collateral one; (2) it must not contradict express or implied provisions of the written contract; (3) it must be one that parties would not ordinarily be expected to embody in the writing, or, put in another way, an inspection of the written contract, read in the light of surrounding circumstances, must not indicate that the writing appears to contain the engagements of the parties, and to define the object and measure the extent of such engagement. Or, again, it must not be so clearly connected with the principal transaction as to be part and parcel of it.") (internal quotation marks omitted).

under Section 4.02.[124] Additionally, as noted, it restricts Amur IV's ability "to make distributions in respect of its equity" in Section 5.07(d). And, at Section 5.07(f), it prohibits Amur IV from transacting with an affiliate in a manner that would unfairly benefit the affiliate and harm the interests of Pine River. Read separately or together, these provisions reflect the parties' intent to address Amur IV's ability to act with respect to its equity and Pine River's security for the Loan. The oral agreement that Amur IV would have the Court recognize addresses Amur IV's ownership rights with respect to the Axis Preferred Stock and the $94k distributions to Amur IV's affiliate. Considering the lengths to which the parties went in their written agreement to address these issues, it is not conceivable that the parties would have entered into a collateral oral agreement pertaining to the $94k distributions that was disconnected from the Credit Agreement.

More to the point, the Credit Agreement contains an integration clause at Section 9.06 in which the parties agreed that "[the Credit Agreement] constitutes the entire contract among the parties relating to the subject matter [] and supersedes any and all previous agreements and understandings, oral or written, relating to the

---

[124] December 2014 Amendment, at § 1(d) (Section 4.02(e) Amendment) ("After giving effect to the acquisition of the Assets to be acquired on such Drawdown Date, the Borrower shall provide evidence that the amount of equity held by the equity holders of the Borrower complies with the Equity Ratio."); ShahMohammed Aff. ¶ 6.

subject matter [thereof]."[125]  This provision forecloses Amur IV's argument that it reached a separate oral agreement with Pine River with respect to the $94k distributions.

In addition to Section 9.06, the parties also agreed to a waivers and amendments clause in Section 9.02, which requires that any amendments to the Credit Agreement be in writing executed by all parties.  No written amendment to the Credit Agreement addressed the $94k distributions.[126]  Moreover, given Section 9.02's clear language to the effect that the parties cannot waive their rights under the Credit Agreement by failing to assert them, Amur IV cannot be heard to argue that Pine River's acquiescence to Amur IV's prior $94k distributions out of the Collections Account constitutes a waiver of its right to enforce Section 5.07.[127]

---

[125] Credit Agmt., at § 9.06.

[126] The record contains two written amendments to the Credit Agreement, Am. Compl. Ex. B, C, neither of which even mention the Dividend or the $94k distributions.  These amendments, however, do reflect that when the parties wanted to amend the Credit Agreement, they knew how to do it.

[127] Nor can Amur IV contend that its alleged side agreement with Pine River somehow amended or altered the written Amendments to the Credit Agreement.  Both Amendments make clear that the integration, waiver and amendments clauses of the Credit Agreement "apply *mutatis mutandis*" to the Amendments.  Amendment No. 1, at § 5; Amendment No. 2, at § 4.

**D. Amur IV's Breach of Sections 5.07(d) and 5.07(f) Resulted in an Event of Default Under Section 7.01(f)**

Under the Credit Agreement, an Event of Default occurs when Amur IV "fail[s] to observe or perform any covenant, condition or agreement contained in Article V."[128] Amur IV's breach of both Sections 5.07(d) and 5.07(f) constitute failures to perform covenants in Article V and are, therefore, Events of Default under Section 7.01(f).[129]

## III. CONCLUSION

For the foregoing reasons, Pine River's motion for partial summary judgment is DENIED as to Count VIII and GRANTED as to Count IX. The parties shall confer and submit an implementing order within 10 days.[130]

---

[128] Credit Agmt., at § 7.01 (f).

[129] *Key Int'l Mfg. Inc. v. Stillman*, 480 N.Y.S.2d 528 (N.Y. App. Div. 1984), *aff'd*, 66 N.Y.S.2d 924 (N.Y. 1985) (declaring an event of default even after acknowledging that the result was harsh, noting that "absent some element of fraud, exploitive overreaching or unconscionable conduct to exploit a technical breach, there is no warrant, either in law or in equity, for a court to refuse enforcement of the agreement of the parties") (internal quotation omitted).

[130] The form of order should address next steps to be taken in the litigation given the Court's findings here.